[No. B137074. Second Dist., Div. Five. Mar. 16, 2000.]

AMERICAN GOLF CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ALBERT BECKER, Real Party in Interest.

**COUNSEL**

Law Offices of Terrence J. Giannone, Terrence J. Giannone; Hancock, Rothert & Bunshoft, John E. Fagan and Joseph P. Collins for Petitioner.

No appearance for Respondent.

Bishton Gubernick, Norris J. Bishton, Jr., and Jeffrey S. Gubernick for Real Party in Interest.

**OPINION**

**GRIGNON, Acting P. J.**—An errant shot by a golfer ricocheted off a wooden yardage marker, injuring a companion golfer. We conclude the injured golfer's personal injury action against the golf course for negligent design and placement of the yardage marker is barred by the primary assumption of the risk doctrine. We hold golf is an active sport, errant shots are an inherent risk of golf, yardage markers are an integral part of the sport, and the golf course as recreation provider did not increase the risk of injury by its design and placement of the yardage marker. We grant the golf course's petition for writ of mandate directing respondent court to grant its motion for summary judgment.

### FACTS AND PROCEDURAL BACKGROUND

On November 22, 1997, plaintiff and real party in interest Albert Becker was playing golf with his companion, Stan Christopherson, at defendant and petitioner American Golf Corporation's Lakewood Country Club and Tennis Center (golf course). Both players teed off the 13th tee and then rode in a golf cart down the fairway to a point where Christopherson's golf ball was located in the rough on the left side of the fairway, approximately 210 yards from the hole. A removable wooden yardage marker, indicating the center of the green was 200 yards distant, was located 5 to 15 yards down the fairway

and 5 to 10 yards left of Christopherson's ball. The yardage marker was not in Christopherson's line of play. Becker remained seated in the golf cart, parked to the right and 10 yards behind Christopherson's ball. Christopherson hooked the ball to the left; the ball ricocheted off the yardage marker, striking Becker in the eye.

The 13th hole runs due east and is 402 yards long with a slight dogleg to the right, approximately 200 yards from the tee. There are trees on both sides of the fairway. A sand bunker is located on the northern edge of the dogleg and small trees are located on the southern edge of the dogleg. The 200-yard marker is located in the rough, 4½ feet south of the sand bunker and 15½ feet north of the fairway.

Of the 18 holes at golf course, 14 (the par four and five holes) have three pairs of yardage markers, located in the rough at 100, 150, and 200 yards from the center of the green on each side of the fairway. The yardage markers are wooden posts painted red, white, or blue, depending on the distance. Each marker is approximately 3¼ by 4⅝ by 26 inches, is placed in a plastic sleeve embedded in the ground, and protrudes approximately 20 inches vertically from the ground. The yardage markers are designed and located to be visible to golfers. If it obstructs the line of play, a yardage marker may be removed from its sleeve.

Golfers drive initially from the tee; the first drive is for maximum distance. The second and subsequent drives require the gauging of distances. Distance determines club selection and strength of the swing. Visible yardage markers are placed on both sides of the fairway so golfers can determine the distance to the center of the green. Most golf courses provide yardage markers at intervals. Yardage markers may be concrete plaques, plants, stones, logs, posts, or signs. Posts and signs may be wood, wire, rubber, or plastic.

Golf course uses this same yardage marker system at other golf courses it owns in the Lakewood/Long Beach area. This yardage marker system is used at 20 to 25 percent of golf courses in the country. Golf courses are designed with both fixed and removable obstacles, to make play interesting and challenging. Fixed obstacles include trees, lakes, ponds, benches, bridges, sand bunkers, sand traps, and rocks. Prior to Becker's injury, no one had reported an injury from a ball ricocheting off a yardage marker or any other obstacle on this golf course.

Becker sued golf course. Golf course moved for summary judgment based on the doctrine of primary assumption of the risk. Its motion was supported

by the declaration of its director of maintenance and the deposition testimony of Becker and Christopherson. Becker opposed the motion, arguing the doctrine was inapplicable because, although the risk of being hit by an errant ball is inherent in the sport of golf, golf course increased the risk of injury by using wooden yardage markers and locating them near the fairway. Becker's opposition was supported by the declaration of an accident reconstruction expert who opined that the yardage marker in question was dangerous or defective because of its rigid and hard construction and its location near the fairway. He asserted that because of the design of the 13th hole, a golfer was likely to aim the tee shot in the direction of the 200-yard marker, thus making the marker a likely site for a ricochet shot.

The trial court denied the motion. Golf course filed this timely petition for writ of mandate.

DISCUSSION

*Standard of Review*

■ " 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) ■ We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

*Assumption of the Risk*

"As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another

person. [Citation.] Thus, for example, a property owner ordinarily is required to use due care to eliminate dangerous conditions on his or her property. [Citation.] In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315 [11 Cal.Rptr.2d 2, 834 P.2d 696].) "In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant." (*Ibid.*) "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Id.* at pp. 315-316.) "In some situations, however, the careless conduct of others is treated as an 'inherent risk' of a sport, thus barring recovery by the plaintiff." (*Id.* at p. 316.) "[R]esolution of the question of the defendant's liability in such cases turns on whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against a particular risk of harm. As already noted, the nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." (*Id.* at pp. 316-317.)

Under the assumption of the risk doctrine, ordinarily a recreation provider owes no duty to a participant in an active sport to use due care to eliminate risks inherent in the sport. In *Knight v. Jewett, supra,* 3 Cal.4th 296, and its companion case *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769], the Supreme Court distinguished between primary and secondary assumption of the risk. Primary assumption of the risk "embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk . . . ." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 308.) Therefore, if the doctrine applies, there is no duty and the plaintiff's assumption of the risk acts as a complete bar to liability. (*Ibid.*) Secondary assumption of the risk, in contrast, refers to those instances in which the defendant owes a duty of care, but the plaintiff knowingly encounters a risk created by the breach of the duty. (*Id.* at p. 310.) Unlike primary assumption of the risk cases, secondary assumption of the risk cases are subsumed into the comparative fault scheme, and a plaintiff's assumption of the risk does not act as a bar to the action. (*Id.* at p. 315.)

"Generally, the participation in an active sport is governed by primary assumption of risk, and a defendant owes no duty of care to protect a plaintiff against risks inherent in the sport." (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632 [53 Cal.Rptr.2d 657].) However, a recreation provider owes a participant in an active sport a duty, under the

secondary assumption of the risk doctrine, not to increase the risk of harm over and above the inherent risk of the sport. (*Morgan v. Fuji Country USA. Inc.* (1995) 34 Cal.App.4th 127, 132 [40 Cal.Rptr.2d 249].) If a risk is inherent in a sport, the fact that a defendant had a feasible means to remedy the danger does not impose a duty to do so. (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 13 [45 Cal.Rptr.2d 855].) A duty is not created because safer materials are available to remedy the danger. (*Ibid.*) The standards in the industry define the nature of the sport. (*Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 52 [72 Cal.Rptr.2d 337] [youth baseball batting helmet constructed without a face guard]; *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430, 439 [52 Cal.Rptr.2d 812] [preseason football practice conducted without pads and helmets]; *Ferrari v. Grand Canyon Dories, supra,* 32 Cal.App.4th at p. 257 [white water raft configured with metal frame superstructure].)

*Summary Judgment*

"In a given active sport setting, the question whether the defendant owes a duty to the plaintiff 'is a *legal* question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury. [Citation.] Thus, the question of assumption of risk is much more amenable to resolution by summary judgment under a duty analysis . . . .' [Citation.] Thus, under *Knight* [*v. Jewett, supra,* 3 Cal.4th 296] a trial court is to determine the question of duty as a function of the scope and definition of a given active sport's inherent risks. [¶] In many active sports cases, this principal determination of the question of duty leads to a second duty analysis. Although a defendant generally owes no duty to protect against the risks inherent in a sport, the defendant generally owes a duty not to *increase* the risks of the activity beyond the risks inherent in the sport. [Citation.] This second determination of duty, however, still hinges upon the trial court's determination of the question of duty in the first instance, by defining the risks inherent in the sport at issue." (*Staten v. Superior Court, supra,* 45 Cal.App.4th at pp. 1632-1633.) It is for the court to decide whether an activity is an active sport, the inherent risks of that sport, and whether the defendant has increased the risks of the activity beyond the risks inherent in the sport. (*Id.* at p. 1634.) Although an expert may not determine matters that are within the province of the court to decide, expert opinion may inform the court on these questions. (Cf. *id.* at pp. 1635-1637; see e.g., *Mosca v. Lichtenwalter* (1997) 58 Cal.App.4th 551, 552-553 [68 Cal.Rptr.2d 58].)

*Golf*

Golf is an active sport to which the assumption of the risk doctrine applies. (*Dilger v. Moyles* (1997) 54 Cal.App.4th 1452, 1454 [63 Cal.Rptr.2d

591].) "Hitting a golf ball at a high rate of speed involves the very real possibility that the ball will take flight in an unintended direction. If every ball behaved as the golfer wished, there would be little 'sport' in the sport of golf. That shots go awry is a risk that all golfers, even the professionals, assume when they play." (*Id.* at p. 1455.) Errant golf shots may strike a fixed object, such as a rock, tree or fence, ricochet, and strike another player.

"The duty of a golf course towards a golfer is to provide a reasonably safe golf course. This duty requires the golf course owner 'to minimize the risks without altering the nature of the sport. [Citations.]' " (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 134.) "Thus, the owner of a golf course has an obligation to design a golf course to minimize the risk that players will be hit by golf balls, e.g., by the way the various tees, fairways and greens are aligned or separated. In certain areas of a golf course, because of the alignment or separation of the tee, fairway and/or greens, the golf course owner may also have a duty to provide protection for players from being hit with golf balls 'where the greatest danger exists and where such an occurrence is reasonably to be expected [citation]' . . . " (*Ibid.*)

*Yardage Markers*

■ Becker contends triable issues of fact exist as to whether golf course increased the risk to him of being hit by an errant shot by its design and placement of the yardage marker. He argues that this case falls under the secondary assumption of the risk doctrine and thus he is entitled to a jury trial on the issue of comparative fault. We disagree.

Yardage markers are used at most golf courses to assist golfers in gauging the distance to the green. It is common in the golf industry for hard yardage markers to be utilized. Golf course's yardage marker system utilizing three visible wooden posts on each side of the fairway is found on 20 to 25 percent of the nation's golf courses. Thus, yardage markers are an integral part of the sport of golf, and the yardage marker system used at golf course is standard in the industry. Obstacles, both fixed and removable, are also an integral part of the sport of golf. Because errant shots are an inherent risk of golf and errant shots by definition take flight in unintended directions, golf involves the very real possibility that a player will hook or slice a ball, the ball will strike a hard obstacle, and the ball will ricochet forcibly. Of course, the risk of ricochet is dramatically reduced where the obstacle in question is removable at the option of the players, if it is in the line of play and poses a danger.

It is apparent from the foregoing that golf course did not increase the risk that Becker would be struck by an errant shot by the construction or

placement of the 200-yard marker on the 13th fairway. In this case, Becker was injured because Christopherson hooked his shot and struck a removable obstacle, which was not in the line of play and had not been removed. There had been no prior reports of injuries caused by the construction or location of either this particular yardage marker or any of the 84 removable wooden yardage markers located in the rough on both sides of 14 fairways. Thus, this was not an area of great danger or a place where such occurrences could reasonably be expected. Accordingly, golf course had no duty to protect Becker from the inherent risk of being hit by an errant shot, and the primary assumption of the risk doctrine bars Becker's action.

Plaintiff's expert's opinion that this particular yardage marker should have been located farther from the fairway or made of a softer material is not sufficient to create a duty on the part of golf course where none exists. In any event, all of plaintiff's expert's objections to the location and construction of the yardage marker are negated by the fact that the markers are indisputably visible to the players and removable at the player's discretion. It will always be possible for a plaintiff who suffers a sports injury to obtain expert testimony that the injury would not have occurred if the recreation provider had done something differently. Such expert testimony is not sufficient to establish that the recreation provider increased the inherent risks of the sport. Such expert opinion does not create a triable issue of fact on a motion for summary judgment based on the primary assumption of the risk defense.

## DISPOSITION

A peremptory writ shall issue directing respondent court to vacate its order of October 25, 1999, denying the motion of American Golf Corporation for summary judgment and enter a new and different order granting the motion. Costs are awarded to petitioner.

Armstrong, J., and Godoy Perez, J., concurred.