[No. S146114. Aug. 30, 2007.]

JOHNNY SHIN, Plaintiff and Respondent, v.
JACK AHN, Defendant and Appellant.

**COUNSEL**

Barry Bartholomew & Associates, Michael Maguire & Associates and Kathryn Albarian for Defendant and Appellant.

Horvitz & Levy, Barry R. Levy, Mitchell C. Tilner and Jeremy B. Rosen for Association of California Insurance Companies, Farmers Insurance Exchange, National Association of Mutual Insurance Companies and Personal Insurance Federation of California as Amicus Curiae on behalf of Defendant and Appellant.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Duane Morris, John E. Gagan, Jill Haley Penwarden, Michael L. Reitzell and Paul J. Killion for California Ski Industry Association as Amicus Curiae on behalf of Defendant and Appellant.

Knickerbocker Law Corporation, Richard L. Knickerbocker, Gregory G. Yacoubian; and Michael H. Silvers for Plaintiff and Respondent.

Law Office of Daniel U. Smith and Daniel U. Smith for Consumer Attorneys of California as Amicus Curiae.

**OPINION**

**CORRIGAN, J.**—In *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), we considered the duty of care that should govern the liability of sports participants. We recognized that careless conduct by coparticipants is an inherent risk in many sports, and that holding participants liable for resulting injuries would discourage vigorous competition. Accordingly, those involved in a sporting activity do not have a duty to reduce the risk of harm that is inherent in the sport itself. They do, however, have a duty not to increase that inherent risk. (See *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 162, 166 [41 Cal.Rptr.3d 299, 131 P.3d 383] (*Avila*).) Thus, sports participants have a limited duty of care to their coparticipants, breached only if they intentionally injure them or "engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight*, at p. 320, fn. omitted.) This application of the *primary assumption of risk doctrine* recognizes that by choosing to participate, individuals assume that level of risk inherent in the sport.

 This case represents the next generation of our *Knight* jurisprudence. *Knight, supra,* 3 Cal.4th 296, involved touch football. We expressly left open the question whether the primary assumption of risk doctrine should apply to noncontact sports, such as golf. (*Id.* at p. 320, fn. 7.) We address that question here. We hold that the primary assumption of risk doctrine does apply to golf and that being struck by a carelessly hit ball is an inherent risk of the sport. As we explain, whether defendant breached the limited duty of care he owed other golfers by engaging in conduct that was "so reckless as to be totally outside the range of the ordinary activity involved in [golf]" (*id.* at p. 320) depends on resolution of disputed material facts. Thus, defendant's summary judgment motion was properly denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and defendant were playing golf with Jeffrey Frost at the Rancho Park Golf Course in Los Angeles. Defendant, the first of the threesome to

complete the 12th hole, went to the 13th tee box.[1] Plaintiff and Frost then finished putting and followed him. Frost took the cart path to the 13th tee box, which placed him perpendicular to, or slightly behind, defendant and to his right. Plaintiff took a shortcut, which placed him in front of defendant and to his left. Plaintiff stopped there to get a bottle of water out of his golf bag and to check his cell phone for messages. He did so even though he knew (1) that he was in front of the tee box, (2) that defendant was preparing to tee off, and (3) that he should stand behind a player who was teeing off. Defendant inadvertently "pulled"[2] his tee shot to the left, hitting plaintiff in the temple. When struck, plaintiff was 25 to 35 feet from defendant, at a 40- to 45-degree angle from the intended path of the ball. Plaintiff claims his injuries were "disabling, serious, and permanent . . . ."

The parties dispute whether defendant knew where plaintiff was standing when he teed off. Plaintiff alleged that he and defendant made eye contact before defendant hit his shot. However, his accounts of just when that eye contact occurred were inconsistent. In his deposition, plaintiff testified that "we made eye contact *as I was cutting up the hill" toward* the 13th tee box. (Italics added.) On the other hand, in his declaration, plaintiff stated that he made eye contact with defendant after he reached the location where he was struck. "[P]rior to anyone teeing off on the 13th hole, I made eye contact with [d]efendant [Jack] Ahn as he saw me standing in front of him in close proximity to his left."

In his declaration, defendant stated: "During the practice swing I looked to see if the area directly ahead of me where I was aiming was clear. I did not see anyone. I then stepped forward and focused on the golf ball for 15 to 20 seconds while settling into my stance and then I hit the ball."[3] In his deposition, defendant testified he did not know where plaintiff was, either when he took his practice swing or when he actually teed off.

In his declaration, plaintiff's expert stated that golf etiquette requires that a player ensure that no one is in a position to be struck when he or she hits the

---

[1] A tee box, or "teeing ground," is the starting place from which a hole is played. (United States Golf Association (USGA), The Rules of Golf (Jan. 1, 2006) § 2, Definitions, p. 15, italics omitted.) Hitting a shot from the tee box is called "tee[ing] off." (<http://www.worldgolf.com/wglibrary/reference/dictionary/tpage.html> [as of Aug. 30, 2007].)

[2] Defendant is right handed. When a right-handed golfer "pull[s]" a shot the ball goes to the left of the target. The converse applies to left-handed players. (<http://www.worldgolf.com/wglibrary/reference/dictionary/ppage.html> [as of Aug. 30, 2007].)

[3] Generally, in final preparation for hitting a stroke a golfer focuses his or her attention on the ball and does so until he or she has hit the shot.

ball. (See USGA, The Rules of Golf, *supra*, § 1, Etiquette, p. 1.) If defendant knew plaintiff was in jeopardy, he should have shouted a warning before teeing off. (*Ibid.*)

When plaintiff sued for negligence, defendant sought summary judgment, relying on the primary assumption of risk doctrine. The trial court initially agreed that the doctrine applied, found no triable issue of material fact, and granted summary judgment. However, the trial court later reversed itself, concluding that triable issues remained.

The Court of Appeal affirmed, holding that the primary assumption of risk doctrine did not apply. This holding was contrary to that in *Dilger v. Moyles* (1997) 54 Cal.App.4th 1452 [63 Cal.Rptr.2d 591] (*Dilger*), in which a different district of the Court of Appeal held that being struck by a ball is a risk inherent in golf and that the primary assumption of risk doctrine applied to the case of a defendant whose errant shot struck another golfer playing a different hole. The Court of Appeal in this case distinguished *Dilger* on the ground that the golfer whose ball struck the plaintiff in that case was playing in a different group. Here, plaintiff and defendant were playing together. The Court of Appeal applied general negligence principles and concluded that defendant breached a general duty of care owed to a member of his own playing group by failing to ascertain where he was before teeing off. Because it also determined that plaintiff's conduct raised issues of comparative negligence, it remanded the matter for trial on apportionment of fault.

We reject the duty analysis of the Court of Appeal and conclude that the primary assumption of risk doctrine regulates the duty a golfer owes both to playing partners and to other golfers on the course. Defendant's summary judgment motion was, however, properly denied. Material questions of fact remain bearing on whether defendant breached his limited duty of care to plaintiff by engaging in conduct that was so reckless as to be totally outside the range of the ordinary activity involved in golf. (See *Knight, supra*, 3 Cal.4th at p. 320.)

## II. DISCUSSION

■ Generally, one owes a duty of ordinary care not to cause an unreasonable risk of harm to others. (Civ. Code, § 1714, subd. (a); *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561].) The existence of a duty is not an immutable fact of nature, but rather an expression of policy considerations providing legal protection. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) Thus, the existence and scope of a defendant's duty is a question for the court's resolution. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990,

1004 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*).) When a sports participant is injured, the considerations of policy and duty necessarily become intertwined with the question of whether the injured person can be said to have assumed the risk. (*Avila, supra*, 38 Cal.4th at p. 161.)

California's abandonment of the doctrine of contributory negligence in favor of comparative negligence (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226] (*Li*)) led this court to revisit the assumption of risk doctrine in *Knight, supra*, 3 Cal.4th 296.

### A. Knight *and its Progeny in This Court*

■ In *Knight, supra*, 3 Cal.4th 296, the plurality noted that there are two types of assumption of risk: primary and secondary. (*Id.* at pp. 308–309 (plur. opn. of George, J.).) Under the primary assumption of risk doctrine, the defendant owes *no duty* to protect a plaintiff from particular harms arising from ordinary, or simple negligence. (*Ibid.*) In a sports context, the doctrine bars liability because the plaintiff is said to have assumed the particular risks inherent in a sport by choosing to participate. (*Id.* at pp. 315–316.) Thus, "a court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to that sport in order to determine whether the defendant owes a duty to protect a plaintiff from the particular risk of harm. ([*Knight, supra*, 3 Cal.4th] at pp. 313, 315–317.)" (*Avila, supra*, 38 Cal.4th at p. 161.)

The *Knight* court used baseball as an example. In baseball, a batter is not supposed to carelessly throw the bat after getting a hit and starting to run to first base. However, the primary assumption of risk doctrine recognizes that vigorous bat deployment is an integral part of the sport and a risk players assume when they choose to participate. Especially in the heat of competition, and in an effort to get to first base quickly, a batter may be careless in freeing himself or herself from the bat's encumbrance. Thus, under the doctrine, a batter does not have a duty to another player to avoid carelessly throwing the bat after getting a hit.

■ In *Knight, supra*, 3 Cal.4th 296, we stressed the chilling effect that would flow from imposing liability on touch football players for ordinary careless conduct. "[E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of legal liability for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity . . . ." (*Id.* at pp. 318–319, italics omitted.) Accordingly, we concluded that coparticipants' limited duty of care is to

refrain from intentionally injuring one another or engaging in conduct that is "so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320, fn. omitted.)

A majority of this court has since extended *Knight's* application of the primary assumption of risk doctrine to other sports. (See *Avila, supra,* 38 Cal.4th at p. 161; *Kahn, supra,* 31 Cal.4th at pp. 1004–1005; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068 [68 Cal.Rptr.2d 859, 946 P.2d 817] (*Cheong*).)

*Cheong, supra,* 16 Cal.4th 1063, involved skiing. One skier sued another for injuries he suffered when the other skier turned and unintentionally ran into him. We concluded that, "under the applicable common law principles, a skier owes a duty to fellow skiers not to injure them intentionally or to act recklessly, but a skier may not sue another for simple negligence . . . ." (*Id.* at p. 1066.) Because there was no evidence that the defendant acted recklessly or intentionally injured the plaintiff, we concluded that the defendant's motion for summary judgment was properly granted. (*Ibid.*)

In *Kahn, supra,* 31 Cal.4th 990, the plaintiff was a 14-year-old novice on a school swim team. She broke her neck during a meet when she executed a practice dive into a shallow racing pool located on school property. She sued the school district, alleging that the injury was caused in part by the failure of her coach, a district employee, to give her any instruction in how to safely dive into a shallow pool. She also sued the coach as an individual for failing to adequately supervise her and for insisting that she dive or risk dismissal. (*Id.* at p. 995.)

We applied the primary assumption of risk doctrine based on the coach's relationship to the sport. Although, the individual defendant was the swimmer's coach, rather than an active competitor, he had a direct relationship to the competition. "[T]he relationship of a sports instructor or coach to a student or athlete is different from the relationship between coparticipants in a sport. But because a significant part of an instructor's or coach's role is to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks, and because the fulfillment of such a role could be improperly chilled by too stringent a standard of potential legal liability, we conclude that the same general standard should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student. A sports instructor may be found to have breached a duty of care to a student or athlete only if the instructor intentionally injures the student or

engages in conduct that is reckless in the sense that it is 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching the sport." (*Kahn, supra*, 31 Cal.4th at p. 996.)

Applying that standard, we concluded the defendants' summary judgment motion was granted in error. We noted "evidence of defendant coach's failure to provide plaintiff with training in shallow-water diving, his awareness of plaintiff's intense fear of diving into shallow water, his conduct in lulling plaintiff into a false sense of security by promising that she would not be required to dive at competitions, his last-minute breach of this promise in the heat of a competition, and his threat to remove her from competition or at least from the meet if she refused to dive. Plaintiff's evidence supports the conclusion that the maneuver of diving into a shallow racing pool, if not done correctly, poses a significant risk of extremely serious injury, and that there is a well-established mode of instruction for teaching a student to perform this maneuver safely. The declarations before the trial court raise a disputed issue of fact as to whether defendant coach provided any instruction at all to plaintiff with regard to the safe performance of such a maneuver, as well as to the existence and nature of the coach's promises and threats. Under these circumstances, the question whether the coach's conduct was reckless in that it fell totally outside the range of ordinary activity involved in teaching or coaching this sport cannot properly be resolved on summary judgment." (*Kahn, supra*, 31 Cal.4th at pp. 996–997.)

*Avila, supra*, 38 Cal.4th 148, involved intercollegiate baseball. A pitcher on the Rio Hondo Community College team (Rio Hondo) hit a batter on the Citrus Community College team (Citrus). The next inning the Citrus pitcher allegedly retaliated by hitting a Rio Hondo batter with a "beanball." The Rio Hondo player sued the Citrus Community College District for negligence. We held the suit was barred by the primary assumption of risk doctrine.[4] It is against the rules of baseball to intentionally throw at a batter. (38 Cal.4th at p. 165.) Nevertheless, "being intentionally thrown at is a fundamental part and inherent risk of the sport of baseball. It is not the function of tort law to police such conduct." (*Ibid.*, fn. omitted.)

Plaintiff urges us to repudiate the primary assumption of risk doctrine. He relies upon arguments made against it by the authors of the separate opinions in *Knight, supra*, 3 Cal.4th 296, 321–338. Continuing to find those arguments unpersuasive, we reaffirm the doctrine, as we did in *Cheong, supra*, 16 Cal.4th 1063, 1067, *Kahn, supra*, 31 Cal.4th 990, 1005, footnote 2, and *Avila, supra*, 38 Cal.4th 148, 160–165.

---

[4] We also held that Government Code section 831.7's immunity protection does not extend to injuries sustained during supervised school sports. (*Avila, supra*, 38 Cal.4th at pp. 154–160.)

### B. *Court of Appeal Cases Applying* Knight *to Golf*

In *Knight, supra,* 3 Cal.4th 296, we expressly left open the question whether the primary assumption of risk doctrine should be applied to sports like golf. (*Id.* at p. 320, fn. 7.) Subsequently, Courts of Appeal have grappled with the issue.

As noted, in *Dilger, supra,* 54 Cal.App.4th 1452, the plaintiff was playing one hole when she was struck by a ball hit from another. Dilger sued the other golfer, in whose favor the trial court entered summary judgment.

The Court of Appeal affirmed, holding that the primary assumption of risk doctrine applied. "[T]he court's reasoning [in *Knight, supra,* 3 Cal.4th 296,] in limiting active sports participants' liability applies equally as well to the sport of golf.

"While golf may not be as physically demanding as . . . basketball or football, risk is nonetheless inherent in the sport. Hitting a golf ball at a high rate of speed involves the very real possibility that the ball will take flight in an unintended direction. If every ball behaved as the golfer wished, there would be little 'sport' in the sport of golf. That shots go awry is a risk that all golfers, even the professionals, assume when they play.

"Holding participants liable for missed hits would only encourage lawsuits and deter players from enjoying the sport. Golf offers many healthful advantages to both the golfer and the community. The physical exercise in the fresh air with the smell of the pines and eucalyptus renews the spirit and refreshes the body. The sport offers an opportunity for recreation with friends and the chance to meet other citizens with like interests. A foursome can be a very social event, relieving each golfer of the stresses of business and everyday urban life. Neighborhoods benefit by the scenic green belts golf brings to their communities, and wild life enjoy and flourish in a friendly habitat. Social policy dictates that the law should not discourage participation in such an activity whose benefits to the individual player and to the community at large are so great." (*Dilger, supra,* 54 Cal.App.4th at pp. 1454–1455, fn. omitted.)

In *American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30 [93 Cal.Rptr.2d 683], a golfer's shot ricocheted off a wooden yardage marker[5] and injured his companion. The companion sued the golf course for negligent

---

[5] Golfers initially hit from the tee and the goal of the first shot is generally maximum distance. Subsequent shots require the gauging of distances. The desired distance influences what club the golfer selects and how the swing is executed. Visible yardage markers are placed to indicate the distance to the green.

design and placement of the marker. The Court of Appeal, relying upon *Dilger, supra,* 54 Cal.App.4th 1452, applied the primary assumption of risk doctrine. (*American Golf Corp.*, at p. 39.) It granted the golf course's petition for writ of mandate directing the trial court to grant its motion for summary judgment. (*Id.* at p. 33.) "We hold golf is an active sport, errant shots are an inherent risk of golf, yardage markers are an integral part of the sport, and the golf course as recreation provider did not increase the risk of injury by its design and placement of the yardage marker." (*Ibid.*)

The court in *Hemady v. Long Beach Unified School Dist.* (2006) 143 Cal.App.4th 566 [49 Cal.Rptr.3d 464] considered the question of inherent risk in a different context. There, one student inadvertently hit another with a golf club during a seventh grade physical education class. The injured student sued the school district and the instructor for negligence. The trial court granted the defendants' motion for summary judgment. Applying the primary assumption of risk doctrine, it concluded that the plaintiff failed to raise a triable issue of material fact as to whether the defendants' conduct was extraordinarily reckless within the meaning of *Knight, supra,* 3 Cal.4th at page 320. (*Hemady,* at p. 572.) The Court of Appeal reversed. Noting that the primary assumption of the risk doctrine bars liability for those injuries arising from the particular risks that are inherent in a sport (*Knight, supra,* 3 Cal.4th at pp. 315–316), the Court of Appeal concluded that being hit on the head by a club is not an inherent risk in golf. Thus a conventional duty analysis was called for. (*Hemady,* at p. 576.)

### C. *The Court of Appeal's Inappropriate Limitation of* Dilger

The Court of Appeal here concluded that golf is an active sport in which participants run the risk of being hit by an errant ball. Nevertheless, it declined to apply the primary assumption of risk doctrine. It distinguished *Dilger, supra,* 54 Cal.App.4th 1452, on the ground that the plaintiff there was struck by a ball hit from another hole, whereas Johnny Shin was struck by a ball hit by a member of his own threesome.

In support of its conclusion, the Court of Appeal reached back to 1974 and outside California authority to the Louisiana case of *Allen v. Pinewood Country Club, Inc.* (La.Ct.App. 1974) 292 So.2d 786 (*Allen v. Pinewood*).

In *Allen v. Pinewood, supra,* 292 So.2d 786, the plaintiff and the defendant were golfers in the same foursome. After all of the players hit their tee shots, they walked to their respective balls. The defendant had "topped" his tee shot, landing far behind the plaintiff. The defendant shouted "fore" and hit his second shot. The plaintiff, hearing the shout, turned around and was struck in the face by the ball. (*Id.* at p. 788.)

The Louisiana court described the pivotal issue as "whether plaintiff was guilty of negligence barring his recovery by proceeding ahead of a member of plaintiff's own party whom plaintiff knew, or had reason to know, would [hit his shot] next." (*Allen v. Pinewood, supra,* 292 So.2d at p. 789.) The court held the defendant was liable under a proximate cause analysis. If the plaintiff was negligent in proceeding ahead of the defendant, his negligence was only a remote cause of his injury, whereas the defendant's negligence, in making his shot without ensuring the plaintiff had heard his warning, was the proximate cause. (*Id.* at pp. 789–790.)

*Allen v. Pinewood, supra,* 292 So.2d 786, was a slender reed upon which to lean. The intermediate appellate court in Louisiana decided the case almost two decades before this court issued its opinion in *Knight, supra,* 3 Cal.4th 296. Thus, it applied a conventional negligence analysis. It did not consider the primary assumption of risk doctrine or whether that doctrine should apply to golf. Certainly it did not address whether, in applying the doctrine to golf, a distinction should be drawn among defendants based on whether they are members of the plaintiff's playing group.

■ We are not persuaded that a case should turn on whether a defendant is playing with the plaintiff, or in another group. The question of duty involves the relationship of the parties to the sport. (*Knight, supra,* 3 Cal.4th at p. 309.) Coparticipants have the same relationship to the sport whether they are in the same playing group or not. This analysis is consistent with our conclusion in *Cheong, supra,* 16 Cal.4th 1063. There the parties were not competing against each other. They were coparticipants, however, because they were both engaged in the same sport, at the same time, using a common venue. The golfers both here and in *Dilger, supra,* 54 Cal.App.4th 1452, were sharing the same course, just as the skiers in *Cheong* were using the same ski run.

### D. Sister-state Decisions

The first court to apply the reckless disregard or intentional conduct standard to golf appears to have been the Supreme Court of Ohio in *Thompson v. McNeill* (1990) 53 Ohio St. 3d 102 [559 N.E.2d 705] (*Thompson*). (*Schick v. Ferolito* (2001) 167 N.J. 7 [767 A.2d 962, 966] (*Schick*).) In *Thompson,* at page 706, the defendant "shanked"[6] a shot. The plaintiff, a member of the defendant's foursome, was standing at a 90-degree angle to the intended path of a ball that struck her. The Ohio Supreme Court held that "only injuries caused by

---

[6] "Shanking" a golf shot has been defined as "strik[ing] the ball with the part of the club head where the heel is joined to the shaft, causing the ball to squirt off dramatically on an outward path (dead right for right-handed golfers)." (<http://www.golfclevelandohio.com/G2003-main.htm> [as of Aug. 30, 2007].)

intentional conduct, or in some instances reckless misconduct, may give rise to a cause of action [by one golfer against another]." (*Thompson*, at p. 706.)

Applying that standard, the *Thompson* court affirmed a grant of summary judgment in the defendant's favor. "Shanking the ball is a foreseeable and not uncommon occurrence in the game of golf. The same is true of hooking, slicing, pushing, or pulling a golf shot. We would stress that '[i]t is well known that not every shot played by a golfer goes to the point where he intends it to go. If such were the case, every player would be perfect and the whole pleasure of the sport would be lost. It is common knowledge, at least among players, that many bad shots must result although every stroke is delivered with the best possible intention and without any negligence whatsoever.' *Benjamin v. Nernberg* (1931), 102 Pa.Super. 471, 475–476 [157 A. 10, 11]." (*Thompson, supra*, 559 N.E.2d at p. 709.)

In *Schick, supra*, 767 A.2d 962, the New Jersey Supreme Court followed *Thompson, supra*, 559 N.E.2d 705, as well as *Dilger, supra*, 54 Cal.App.4th 1452. In *Schick*, at page 963 the defendant hit a second tee shot, or "mulligan,"[7] striking a member of his foursome. The New Jersey Supreme Court applied the reckless or intentional misconduct standard. "We perceive no persuasive reason to apply an artificial distinction between 'contact' and 'noncontact' sports. In fact, only a minority of courts do so. [Citations.]" (*Schick*, at p. 968.) The New Jersey Supreme Court went on to hold that the trial court erred in granting the defendant's motion for summary judgment because the facts would have supported a verdict of recklessness. The court pointed to "defendant's own testimony that he perceived plaintiff to be in the 'line of fire' and that he waved plaintiff off in an effort to induce plaintiff to move from his location." (*Id.* at p. 970.) Plaintiff did not move. The defendant did not wait for him to do so and hit his shot anyway. The court held, "[t]hat scenario presents a set of facts that a jury could find constitutes reckless conduct because it may reflect a conscious choice of a course of action with knowledge or reason to know that the action will create serious danger to others." (*Ibid.*)

In *Gray v. Giroux* (2000) 49 Mass.App.Ct. 436 [730 N.E.2d 338], the Massachusetts Appeals Court held that "the wilful, wanton, or reckless standard of conduct, and not ordinary negligence is the appropriate standard of care in noncontact sports such as golf." (*Id.*, 730 N.Ed.2d at p. 341.) Applying that standard, the appeals court affirmed the grant of summary judgment in favor of the defendant, a member of the plaintiff's playing group.

---

[7] A "mulligan" is a second shot sometimes permitted in friendly play, but not allowed under the rules, when a player has mis-hit his or her first shot. (<http://www.worldgolf.com/wglibrary/reference/dictionary/mpage.html> [as of Aug. 30, 2007].)

"Here, the undisputed facts demonstrate that the plaintiff was standing at the edge of the woods on the left side of the fairway about thirty-five to fifty yards in front of the defendant, whose ball was in the rough on the same side. Because the hole was a dogleg to the right, and the plaintiff and the defendant were both on the left side of the fairway, the defendant obviously was not aiming his shot toward the edge of the woods where the plaintiff was standing; instead, he was trying to place the ball on the green to the right. Thus, the plaintiff was not within the intended path of the defendant's shot. Moreover, it is undisputed that the defendant did not see the plaintiff before he took his shot. In these circumstances, the fact that the defendant's shot did not follow its intended path does not amount to wilful, wanton, or reckless conduct." (*Ibid.*, fns. omitted.)

In *Allen v. Donath* (Tex.Ct.App. 1994) 875 S.W.2d 438, the plaintiff was struck by a "mulligan" hit by a member of his threesome. It was disputed whether the defendant announced his intention to hit a second ball. The Texas Court of Appeals, following the Ohio Supreme Court's decision in *Thompson, supra*, 559 N.E.2d 705, rejected the plaintiff's argument that the appropriate standard of care should be dependent on whether the sport in question is a contact sport. " 'While the genteel game of golf can hardly be described as a "competitive contact sport," we believe the reckless and intentional standard is every bit as appropriate to conduct on the links as it is to conduct on the polo field.' " (*Allen v. Donath*, at p. 440.) The court affirmed the judgment in favor of the defendant on the ground that the jury was properly instructed on the standard of care. (*Ibid.*)

In *Yoneda v. Tom* (2006) 110 Haw. 367 [133 P.3d 796], the plaintiff was struck by a ball hit by a golfer in another group. The plaintiff sued the other golfer as well as the owner and operator of the golf course. The Hawaii Supreme Court concluded that the primary assumption of risk doctrine applied to define the defendant golfer's duty, relying in part on *Knight, supra*, 3 Cal.4th 296, and *Dilger, supra*, 54 Cal.App.4th 1452. (*Yoneda*, 133 P.3d at pp. 804–809.) Upholding a grant of summary judgment for the defendant golfer, the Hawaii Supreme Court ruled that no one could have reasonably anticipated that a person in the plaintiff's location was in danger of being struck by the defendant's shot. (*Id.* at p. 809.)[8]

---

[8] The Illinois Court of Appeal has charted a different course, adopting the "contact sport" distinction. In *Zurla v. Hydel* (1997) 289 Ill.App.3d 215 [224 Ill.Dec. 166, 681 N.E.2d 148], the plaintiff was struck by a ball hit by a member of his threesome. The Court of Appeal concluded that "a golfer injured by a golf ball need only allege and prove traditional negligence in order to recover damages, rather than wilful and wanton conduct." (*Id.*, 681 N.E.2d at p. 152.) It reached that conclusion on the ground that "golf is not properly characterized as a 'contact sport' . . . ." (*Ibid.*) "Rather, golf is a sport which is contemplative and careful, with emphasis placed on control and finesse, rather than speed or raw strength." (*Ibid.*)

### E. *Application of the Primary Assumption of Risk Doctrine*

■ The lesson to be drawn from *Knight, supra*, 3 Cal.4th 296, and its progeny, as well as the weight of authority in sister states, is that the primary assumption of risk doctrine should be applied to golf. Thus, we hold that golfers have a limited duty of care to other players, breached only if they intentionally injure them or engage in conduct that is "so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320, fn. omitted.)

The Court of Appeal relied too heavily on one of golf's rules of etiquette involving safety. Golf's first rule of etiquette provides that "[p]layers should ensure that no one is standing close by or in a position to be hit by the club, the ball or any stones, pebbles, twigs or the like when they make a *stroke* or practice swing."[9] (USGA, The Rules of Golf, *supra*, § 1, Etiquette, p. 1.) The Court of Appeal concluded that "[t]his duty included the duty to ascertain Shin's whereabouts before hitting the ball."

Rules of etiquette govern socially acceptable behavior.[10] The sanction for a violation of a rule of etiquette is social disapproval, not legal liability. This is true, generally, of the violation of the rules of a game. "The cases have recognized that, [in sports like football or baseball], even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of legal liability for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight, supra*, 3 Cal.4th at pp. 318–319, italics omitted; see *Avila, supra*, 38 Cal.4th at p. 165.)

---

[9] Four of golf's rules of etiquette involve safety.

"Players should ensure that no one is standing close by or in a position to be hit by the club, the ball or any stones, pebbles, twigs or the like when they make a *stroke* or practice swing.

"Players should not play until the players in front are out of range.

"Players should always alert greenstaff nearby or ahead when they are about to make a *stroke* that might endanger them.

"If a player plays a ball in a direction where there is a danger of hitting someone, he should immediately shout a warning. The traditional word of warning in such situations is 'fore.' " (USGA, The Rules of Golf, *supra*, § 1, Etiquette, p. 1.)

[10] (Merriam-Webster Online <http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=etiquette> [as of Aug. 30, 2007].)

The hortatory character of its etiquette rules is made very clear by the USGA. The USGA explains that these rules are simply "guidelines" as to how the game "should" be played so that "all players will gain maximum enjoyment from the game." (USGA, The Rules of Golf, *supra*, § 1, Etiquette, p. 1.) The use of the term *should* in the etiquette rules was a considered choice. The USGA cautions readers that its "Rules book is written in a very precise and deliberate fashion. You should be aware of and understand the following differences in word use: [¶] may = optional [¶] should = recommendation [¶] must = instruction (and penalty if not carried out)." (USGA, The Rules of Golf, *supra*, p. i.)

### F. *Secondary Assumption of Risk*

In *Knight, supra*, 3 Cal.4th 320, we made clear that in primary assumption of risk cases the defendant owes no duty to protect a plaintiff from a particular risk that the plaintiff is construed to have assumed. In the sports context, the plaintiff is deemed to have assumed those risks inherent in the sport in which plaintiff chooses to participate. A defendant participating in the same sporting activity owes no duty to a coparticipating plaintiff to avoid ordinary negligence as to those risks.

As indicated in *Li, supra*, 13 Cal.3d 804, and clarified in *Knight, supra*, 3 Cal.4th 320, the secondary assumption of risk doctrine relates to the allocation of damages, not to the question of duty. The substantial change adopted in *Li* was to replace the absolute bar to recovery if a plaintiff's own negligence contributed to his or her injury, with a system of comparative fault in which liability was assigned "in direct proportion to the amount of negligence of each of the parties." (*Li*, at p. 829.) The *Li* court did not alter the legally accepted concepts of negligence. (*Id.* at p. 813 & fn. 6a.)

The *Li* court discussed the doctrines of "last clear chance" and "assumption of risk" as concepts that had operated to ameliorate the harshness of the " 'all-or-nothing' " contributory negligence scheme. (*Li, supra*, 13 Cal.3d 804, 824.) Because it was replacing that scheme with the comparative negligence approach it abolished the last clear chance rule. (*Id.* at p. 829.) Likewise it did away with the assumption of risk principle "to the extent that it is merely a variant of the former doctrine of contributory negligence." (*Ibid.*) The *Li* court did not use the terms "primary" and "secondary" assumption of risk. It did, however, observe that under the system of comparative negligence, the defense of assumption of risk would merge into the comparative negligence scheme, to the extent that it had previously operated as a variant of contributory negligence.

*Knight, supra*, 3 Cal.4th 296, clarified the manner and degree to which assumption of risk merged into the comparative negligence scheme. The *Knight*, plurality explained that the *primary* assumption of risk doctrine "embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk." (*Knight*, at p. 308.) It is the *secondary* assumption of risk principle that was merged into *Li*'s new comparative negligence approach. Under this merged approach the analysis proceeds as follows. The first question is whether the defendant has breached a duty to the plaintiff. The duty analysis depends on the nature of the activity or sport and the parties' relationship to it. (*Knight*, at p. 308.) Once it has been established that a duty has been breached, however that duty is appropriately defined under the circumstances of the case, the general principles of comparative fault are applied to assign *liability* in proportion to the

parties' respective fault. Thus, *primary* assumption of risk applies to the question of duty and *secondary* assumption of risk applies to the calculation of damages.

 In applying an assumption of risk analysis it is important not to confuse the question of duty with that of damages. The primary assumption of risk doctrine operates to limit the duty owed by the defendant. If the defendant is found to have breached that duty, the question of damages is calculated by taking the plaintiff's comparative fault, if any, into account. The primary assumption of risk doctrine articulates what kind of *duty* is owed and to whom. Only if a defendant is found to have breached a duty, does the question of damages arise. In California, tort damages are calculated under the principles of comparative fault set out in *Li, supra*, 13 Cal.3d 804. (*Knight, supra*, 3 Cal.4th at p. 300.)

### G. Defendant's Summary Judgment Motion

The remaining issue is whether defendant's motion for summary judgment should have been granted.

The rules of review are well established. If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Kahn, supra*, 31 Cal.4th at pp. 1002–1003.) In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We review the record and the determination of the trial court de novo. (*Kahn*, at p. 1003; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

Here, summary judgment was properly denied because there are material questions of fact to be adjudicated.

 In determining whether defendant acted recklessly, the trier of fact will have to consider both the nature of the game and the totality of circumstances surrounding the shot. In making a golf shot the player focuses on the ball, unlike other sports in which a player's focus is divided between the ball and other players. That is not to say that a golfer may ignore other players before making a shot. Ordinarily, a golfer should not make a shot without checking to see whether others are reasonably likely to be struck.[11] Once having addressed the ball, a golfer is not required to break his or her

---

[11] However, conduct that might be found reckless when engaged in on a crowded course might be found otherwise if the course is largely deserted.

concentration by checking the field again. Nor must a golfer conduct a headcount of the other players in the group before making a shot.

Many factors will bear on whether a golfer's conduct was reasonable, negligent, or reckless. Relevant circumstances may include the golfer's skill level; whether topographical undulations, trees, or other impediments obscure his view; what steps he took to determine whether anyone was within range; and the distance and angle between a plaintiff and defendant.

Here plaintiff testified at his deposition that he and defendant made eye contact "as I was cutting up the hill." He did not make clear, however, how far he had proceeded up the hill, how far away he was from the defendant, or whether he was stationary when the eye contact occurred.[12] At his deposition, defendant said he looked to see if the area "directly ahead" of him was clear. It is not apparent just how broad or limited that area was. This record is simply too sparse to support a finding, as a matter of law, that defendant did, or did not, act recklessly. This will be a question the jury will ultimately resolve based on a more complete examination of the facts. We do not suggest that cases like this can never be resolved on summary judgment, only that this record is insufficient to do so.

### III. DISPOSITION

The judgment of the Court of Appeal is affirmed. The case is remanded with directions that litigation should continue under the primary assumption of risk doctrine.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Fifteen years ago in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), a plurality of this court abandoned the tort doctrine of implied assumption of risk as a defense to a negligence action in sports cases. Adopted in its place was a rule eliminating between sports participants any duty to avoid injury-causing carelessness, the so-called no-duty-for-sports rule. In the intervening

---

[12] In his declaration in opposition to summary judgment, plaintiff said the eye contact occurred when he was standing at the location where he was struck. However, a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses. (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 860 [84 Cal.Rptr.2d 157]; see also *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21–22 [112 Cal.Rptr. 786, 520 P.2d 10].)

years, this rule has found favor with a majority of this court. (See *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

I have disagreed with that rule since its inception in 1992. (See *Knight, supra,* 3 Cal.4th at p. 336 (dis. opn. of Kennard, J.).) Just last year, in a concurring and dissenting opinion in *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148 [41 Cal.Rptr.3d 299, 131 P.3d 383], I said: "I have repeatedly voiced my disagreement with this court's adoption of that rule, which is 'tearing at the fabric of tort law' (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1075 [68 Cal.Rptr.2d 859, 946 P.2d 817] (conc. opn. of Kennard, J.) . . .) . . . ." (*Avila, supra,* at p. 169 (conc. & dis. opn. of Kennard, J.), citation omitted.) And I have pointed out that "because the question of what is 'inherent' in a sport is amorphous and fact-intensive, it is impossible for trial courts 'to discern, at an early stage in the proceedings, which risks are inherent in a given sport.' (*Knight v. Jewett, supra,* 3 Cal.4th at p. 337 (dis. opn. of Kennard, J.).)" (*Ibid.*)

The *Knight* plurality limited the no-duty-for-sports rule to *active* sports, such as the game of touch football in that case where the plaintiff lost a finger as the result of rough play by a fellow player. In the words of the *Knight* plurality: "[A] participant in an *active* sport breaches a legal duty of care to other participants . . . only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra,* 3 Cal.4th at p. 320, italics added.) The plurality further observed: "[W]e have no occasion to decide whether a comparable limited duty of care appropriately should be applied to other less active sports, such as archery or golf." (*Id.* at p. 320, fn. 7.) Today, the majority expressly extends the *Knight* rule to one of those "less active sports," golf, noting that "[t]his case represents the next generation of [this court's] *Knight* jurisprudence." (Maj. opn., *ante,* at p. 486.)

I continue my disagreement with the no-duty-for-sports rule, whether applied to an "active" sport such as touch football or a "less active" one such as golf. I agree, however, with the majority that this case should be remanded for trial. But the majority and I differ on what should be decided at trial. The majority would have the jury decide whether defendant in hitting the golf ball that struck plaintiff was not merely careless but reckless—that is, whether defendant's conduct, in the words of the *Knight* plurality, was "totally outside the range of the ordinary activity" involved in the sport (*Knight, supra,* 3 Cal.4th at p. 320). Under that approach, with which I disagree, a defendant in

a sports injury case is not liable for negligent conduct falling within the ordinary range of the particular sport but is liable only for actions falling outside of that range. In contrast, I would have this case proceed to trial so the jury, applying traditional principles of tort liability, can decide whether defendant acted negligently and, if so, whether, under the traditional tort defense of implied assumption of the risk, plaintiff "truly appreciated and voluntarily consented to the risk" posed by defendant's negligent conduct. (*Knight, supra,* 3 Cal.3d at p. 332 (dis. opn. of Kennard, J.).)