Filed 11/24/20  Kashani v. Wilshire House Association CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| MOUSSA MORADIEH KASHANI,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>WILSHIRE HOUSE ASSOCIATION,<br><br>Defendant and Respondent. | B296976<br><br>(Los Angeles County<br>Super. Ct. No. BC557414)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on October 28, 2020, be modified as follows:

1.  On page 3, the third sentence of the first full paragraph is modified to read as follows:

> Also, Kashani contends he is entitled to nominal damages.

2.  On page 6, line 6 of the first full paragraph, the word "[cover]" is inserted between the words "required" and "letter"

and after the word "letter" add as footnote "[1]" so that the line and footnote read as follows:

> required [cover] letter,[1] deposit, and accompanying documents agreeing

> [1] We express no opinion as to whether Kashani's cover letter was required.

3.  On page 6, the last sentence of the second full paragraph, beginning with "In the 'required letter,' " is modified to read as follows (the current footnote at the end of this sentence remains):

> Kashani's cover letter, however, indicated Kashani sought to change this term, stating he would like to exercise his right of first refusal "through representation of my broker and my sister [Yasmin Moradieh-Kashani]."

4.  On page 7, second full paragraph, the first sentence is modified to read as follows:

> On Kashani's cover letter, Gerowitz handwrote "Received package 5/22/2014 [at] 5:15 p.m.

5.  On page 9, line 5 is modified to read as follows:

> (2) Kashani's cover letter, indicating he wished to use his

6.  The paragraph commencing at the bottom of page 21 with "First, 'any notice or communication' " and ending on page 22 with "face the consequences" is deleted and replaced with the following:

> First, section 17 of the CC&Rs required Kashani to submit "a fully executed *written* offer to purchase the [u]nit, including all exhibits referred to therein, which such offer shall be *identical* in all

2

respects to the offer contained in the [o]ffer [n]otice . . . ."[9]  (Italics added.)  Yet, Kashani's written submission unequivocally sought to modify a material term of the original purchase and sale agreement.  Specifically, Kashani's cover letter stated that his sister would serve as his agent.  Although he orally agreed during an in-person meeting with Gerowitz to use Manns as his agent, he did not make any written correction to this cover letter to reflect such an agreement.  Nor did Kashani correct the 5:18 p.m. email from his sister to Gerowitz on which he was copied that stated he wanted his sister to serve as his agent.  Even if WHA would have accepted Kashani's oral representation to have Manns act as his agent, Kashani thereafter communicated in writing to Gerowitz that his sister was to act as his agent.  At 9:31 p.m., Kashani emailed Gerowitz to express dissatisfaction with Manns.  He complained Manns's refusal to show Unit 704 jeopardized her license and that she would have to face the "consequences."  Kashani did not state in this email that he agreed to Manns as his agent.  Rather, Kashani attached to this email the same cover letter that he submitted earlier in which he stated his sister would serve as his agent.  At 11:02 p.m., Kashani's sister also sent an email to Gerowitz in which she echoed Kashani's complaints and insisted she would serve as her brother's agent.  Then, at 11:18 p.m., Kashani delivered the cover letter to WHA, again.  Thus, Kashani's written submission was not "identical in all respects" to the original purchase agreement as required under the CC&Rs.

[9] Section 19.8 of the CC&Rs also state that "any notice or communication . . . required by [the CC&Rs] shall be in writing."

7. On page 22, at the end of the first full paragraph, after the sentence ending "which was flawed in this respect," add as footnote 10, the following footnote:

> [10] Kashani also points to Rabkin's deposition testimony that Kashani's purchase agreement itself made no modification to the real estate agent. However, Rabkin also testified Kashani's cover letter sought to modify that term.

8. At pages 23 to 28, subsection C of the Discussion is deleted and replaced with the following:

## C. The Trial Court Properly Granted Summary Judgment of Kashani's Cause of Action for Fraud

Kashani alleged WHA made two misrepresentations. First, Kashani claims Gerowitz[12] advised him that in order to exercise his right of first refusal, he needed to "simply cross out each instance in which the name of Soltan[i] Family Trust appeared on the [purchase and sale agreement], to write and initial [Kashani's] name next to each such instance, and then cross out the signature for Soltan[i] Family Trust at the end of the [purchase and sale agreement] and sign the [purchase and sale agreement] himself." Second, Gerowitz told him that he was "in,"

_____

[12] Although Kashani contends in the general allegations of his first amended complaint that attorney Rabkin also advised him how to exercise his right of first refusal, in his cause of action for fraud, Kashani alleges that only Gerowitz made false statements.

4

which Kashani interpreted to mean that his offer was acceptable.[13]  Kashani also alleges that had he known the truth, he would have corrected his submission.

None of Kashani's challenges demonstrates that there was a disputed material fact as to causation.  The elements of fraud are: " ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 837.)  " ' 'A plaintiff asserting fraud by misrepresentation is obliged to . . . " 'establish a complete causal relationship' between the alleged misrepresentations and the harm claimed to have resulted therefrom." ' [Citation.]  'The causation aspect of actions for damage for fraud and deceit involves three distinct elements: (1) actual reliance, (2) damage resulting from such reliance, and (3) right to rely or justifiable reliance.' [Citation.]" (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1062.)

First, as to Gerowitz's instruction that Kashani "simply cross out each instance" of the buyer's name and "write and initial [Kashani's] name next to each such instance," Kashani did not actually rely on this instruction. To the contrary, as described above, he failed to follow it. This failure substantially caused his submission to be noncompliant.

―――――――――――――

[13] We observe that such a statement could have meant only that Kashani submitted his paperwork, sans deposit check, within the required time.

5

Second, Kashani's alleged damages were not the result of Kashani's actual reliance on Gerowitz's statement that he was "in."  Rather, a substantial cause of Kashani's alleged damages was his continued effort to have his sister serve as his agent.  As described above, hours after Gerowitz told Kashani he was in, Kashani (and his sister) expressed vehement dissatisfaction with Manns, Kashani's sister sent an email insisting she would act as his agent, and he twice more submitted his cover letter in which he stated his sister would act as his agent.  Thus, Kashani's own intervening actions after Gerowitz told him he was "in" substantially caused his submission to be noncompliant.

Third, Kashani undertook an independent investigation by which he broke the chain of causation.  "A plaintiff who has access to the necessary information and actually makes an independent investigation that the defendant does not hinder will be charged with knowledge of the facts that reasonable diligence would have disclosed and cannot claim reliance on the representations."  (5 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 930.)  Here, Kashani admits that between the time that Gerowitz advised him that he was "in" and the time he delivered the deposit check several hours later, Kashani reviewed his submission and discovered Gerowitz was wrong.  He was not "in" because he discovered a mistake that Gerowitz had overlooked.  Kashani further admits facts that demonstrate he was a sophisticated party to the transaction:  Kashani had been a real estate investor for 28 years and had purchased units at Wilshire House on two prior occasions through the right of first refusal procedure.  Thus, there is

no question that reasonable diligence would have revealed to him that his offer did not comply by both failing to agree unequivocally and in writing to use Manns as his agent and failing to cross out at least two instances of Soltani Family Trust and write in his own name. There is no evidence in the record that WHA hindered Kashani from exercising such diligence.

Given our ruling, Kashani's argument that he may seek nominal damages is moot as is WHA's argument that the business judgment rule or reliance on advice of its attorney shields it from liability.

There is no change in the judgment. Appellant Kashani's petition for rehearing is denied.

SINANIAN, J.*  ROTHSCHILD, P. J.  BENDIX, J.

---

 * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

7

Filed 10/28/20  Kashani v. Wilshire House Association CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| MOUSSA MORADIEH KASHANI,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>WILSHIRE HOUSE ASSOCIATION,<br><br>Defendant and Respondent. | B296976<br><br>(Los Angeles County<br>Super. Ct. No. BC557414) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

Stubbs Alderton & Markiles, Jeffrey F. Gersh and James A. Sedivy for Plaintiff and Appellant.

Gordon Rees Scully Mansukhani, R. Scott Sokol, Matthew G. Kleiner and Jordan T. Golden for Defendant and Respondent.

————————————

Plaintiff and appellant Moussa Moradieh Kashani is an owner of several condominium units in a real estate development commonly known as Wilshire House Condominiums (Wilshire House). Defendant and respondent Wilshire House Association (WHA) is the homeowners' association for Wilshire House. In May 2014, Kashani sought to exercise his right of first refusal pursuant to WHA's Declaration of Covenants, Conditions and Restrictions (CC&Rs) to buy condominium unit 704 at Wilshire House (Unit 704). Another Wilshire House condominium unit owner, Andres Cantor, also sought to exercise his right of first refusal to purchase Unit 704. Under the CC&Rs, if more than one owner exercises his or her right of first refusal, WHA is to conduct a random drawing to determine which owner may purchase the unit.

WHA, through its attorney Michael Rabkin, determined that Cantor's exercise of his right of first refusal complied with the CC&Rs and that Cantor could purchase Unit 704. Rabkin also determined Kashani's attempt to exercise his right of first refusal did not comply with the CC&Rs, and WHA informed Kashani that he was not eligible to purchase Unit 704. Because there was only one valid exercise of the right of first refusal, WHA did not conduct a random drawing.

Kashani sued, asserting WHA breached the CC&Rs and fraudulently misrepresented to him how to comply with the CC&Rs and that his submission did comply.

WHA moved for summary judgment. Relying on Kashani's discovery responses in which he stated WHA had an obligation under the CC&Rs to conduct a random drawing, the trial court concluded Kashani had only a 50 percent chance of winning the drawing and, thus, could never establish causation or damages by

2

a preponderance of the evidence.  Although Kashani argued in his opposition that his was the only valid offer and a random drawing was not required, the trial court concluded that Kashani could not contradict his earlier position to avoid summary judgment.  The trial court also awarded attorneys' fees and costs to WHA.

On appeal, Kashani argues the trial court erred in granting summary judgment because his opposition raised triable issues of material fact—principally, that his offer complied with the CC&Rs and Cantor's offer did not.  Kashani further argues the trial court erred in not considering his arguments and supporting evidence that Cantor's offer did not comply with the CC&Rs because his declaration did not contradict his discovery responses on this issue.  Also, Kashani contends, for the first time on appeal, that he is entitled to nominal damages.  Kashani also appeals the award for attorneys' fees and costs on the bases that in reversing the motion for summary judgment such fees must also be reversed, and regardless of whether we reverse the summary judgment ruling, the trial court abused its discretion in awarding certain attorneys' fees and costs.

We agree with Kashani that his declaration did not contradict his discovery responses as to whether Cantor's offer complied with the CC&Rs or whether there should be a random drawing.  However, we conclude that there is no disputed issue of material fact that Kashani's offer did not comply with the CC&Rs.  We also conclude Kashani cannot demonstrate a dispute of material fact as to whether WHA's general manager Stacy Gerowitz's allegedly fraudulent statements caused Kashani's alleged damages.  We also conclude, as to the attorneys' fees and

costs that we have jurisdiction to review, that the trial court did not abuse its discretion.  Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We base our factual summary on the parties' undisputed facts or otherwise identify the source of the facts.

### A. Procedure for Exercising a Right of First Refusal According to the CC&Rs

Section 17 of the CC&Rs provides the WHA board (Board) and each owner of a condominium unit in Wilshire House with "a [r]ight of [f]irst [r]efusal to purchase any [c]ondominium upon its [o]wner's voluntary election to sell" the unit.  Section 17.2 requires the Board to mail to each owner "written notice" of the potential sale, including a complete copy, with exhibits, of the third party's offer to purchase the unit.  This mailing triggers the running of a refusal period that concludes at 11:59 p.m. on the 15th day from the mailing.  During the refusal period, the Board or any owner may exercise their right of first refusal.

Section 17.3 of the CC&Rs states, in part, that "[a]ny attempt to exercise the [r]ight of [f]irst [r]efusal shall be invalid and unenforceable unless accomplished during the [r]efusal [p]eriod and in the following manner:  an [o]wner shall submit to the Board a fully executed written offer to purchase the [u]nit, including all exhibits referred to therein, which such offer shall be identical in all respects to the offer contained in the [o]ffer [n]otice, but for the name of the [o]wner making the offer."

According to section 17.4, "If the Board receives more than one offer prior to the expiration of the [r]efusal [p]eriod, it shall determine by random drawing the offer which shall constitute the sole exercise of the [r]ight of [f]irst [r]efusal contained herein."  If

4

the owners do not make an offer prior to the expiration of the refusal period, the seller of the unit may sell the unit to the original prospective third-party buyer.

Section 19.8 of the CC&Rs requires that except as otherwise provided, "any notice or communication . . . required by [the CC&Rs] shall be in writing."

## B. WHA Notifies the Owners of Their Opportunity to Exercise Their Right of First Refusal for Unit 704

Kashani received a letter dated May 7, 2014, from WHA, signed by Gerowitz. The letter provided notice that The Geldin Family Trust intended to sell Unit 704 to the Soltani Family Trust. The letter stated that section 17 of the CC&Rs grants each owner a right of first refusal to purchase Unit 704 and that any exercise of the right of first refusal must be received by the Wilshire House management office by May 22, 2014, at 11:59 p.m. The letter attached a document dated May 5, 2014, which summarized the basic terms of the transaction and indicated that Diane Manns of Coldwell Banker was the agent for the buyer and seller and would receive 5 percent commission (May 5, 2014 Agent Information). The letter also attached a copy of the purchase and sale agreement, with exhibits, and advised the owners to "[p]lease refer to the CC&Rs for additional details."

On May 21, 2014, owner Dr. David Cantor, acting on behalf of his son Cantor, submitted documents and a deposit check in an effort to exercise his right of first refusal.

## C. Kashani Attempts to Exercise His Right of First Refusal for Unit 704

According to his discovery responses, Kashani has been a real estate investor since 1986. Thus, as he averred in his declaration in support of his opposition to the motion for

summary judgment, in May 2014, Kashani owned three condominium units at Wilshire House, "two of which [he] purchased by exercising [his] right of first refusal." On May 22, 2014, Kashani sought to exercise his right of first refusal again, this time to purchase Unit 704.

As Kashani alleged in his first amended complaint: "On May 22, 2014, pursuant to the . . . instructions of WHA's representatives, . . . Gerowitz and WHA's attorney [Rabkin], [Kashani] timely and properly exercised his [r]ight of [f]irst [r]efusal . . . by personally delivering to . . . Gerowitz . . . the required letter, deposit, and accompanying documents agreeing to enter into (i.e., accepting) the [p]urchase and [s]ale [a]greement with . . . Geldin Family Trust to purchase [Unit 704] . . . on the same terms and conditions that were previously agreed between" the Geldin Family Trust and the Soltani Family Trust.

The "accompanying documents" included a copy of the purchase and sale agreement with all exhibits. This document had been executed by the Geldin Family Trust and the Soltani Family Trust, but modified by Kashani in an effort to comply with CC&Rs' section 17.3. This purchase and sale agreement identified Coldwell Banker as the buyer's and seller's agent. In the "required letter" of Kashani's intention to exercise his right of first refusal, however, Kashani indicated he sought to change this term, stating he would like to exercise his right of first refusal "through representation of my broker and my sister [Yasmin Moradieh-Kashani]."[1]

---

[1] To avoid confusion, we refer to Yasmin Moradieh-Kashani by her first name.

In interrogatory responses, Kashani described the circumstances surrounding his submission with more specificity: "At approximately 5:00 p.m. on May 22, 2014, [Kashani] went to the Wilshire House Association management office to exercise his right of first refusal. [Kashani] spoke to Stacy Gerowitz who informed him that he must use Diane Manns as the realtor, not Yasmin Kashani. [Kashani] agreed. She then called Michael Rabkin and put him on speakerphone who instructed [Kashani] to initial and sign everywhere the buyer signed. Plaintiff [*sic*] then reviewed [Kashani's] offer and told him it was acceptable." Kashani also stated in his interrogatory responses that "Gerowitz reviewed [his] offer page by page and approved [Kashani's] offer. She then told him that his offer is accepted, specifically, she told him, 'you're in' and then instructed him to drop off the deposit check."

On Kashani's letter of intention, Gerowitz handwrote "Received package 5/22/2014 [at] 5:15 p.m. Deposit check not included. Will bring tonight." She initialed this note. There was no modification made to the statement that Kashani wanted to be represented by his sister in the transaction. Earlier that afternoon, at 4:25 p.m., Kashani sent an email to his sister that included a draft of the cover letter to Gerowitz, indicating Kashani wanted his sister to represent him in the transaction. At 5:18 p.m., Kashani's sister forwarded this email to Gerowitz with a carbon copy to Kashani. The record does not reflect a later email from Kashani to Gerowitz correcting Kashani's statement that he wanted his sister to serve as his agent.

During her deposition, Gerowitz was asked whether, on May 22, 2014, Kashani asked her for advice regarding how to fill out the purchase and sale agreement. She responded that she

"did indicate a couple of times that I was unable to assist him in filling it out." The record does not otherwise reflect whether WHA disputes Kashani's version of facts regarding his visit to the management office and conversation with Gerowitz and Rabkin.

Then, according to paragraph 6 of Kashani's declaration submitted in support of his opposition to the motion for summary judgment, "On May 22, 2014, at 9:31 p.m. I sent an email to Stacy Gerowitz that included as an attachment the first page of my purchase agreement where I 'crossed-off' the name of 'The Soltani Family Trust' which was replaced with my name as the buyer, with my initials next to that. In preparing the deposit check I noticed that my name was not listed as the buyer, so I made that change at that time." Kashani appended the 9:31 p.m. email and attachments thereto as exhibit 13 to his declaration. The email stated, "enclosed please find copy of deposit check for the total amount of $55,050 that represent 3[ percent] of purchase price at $1,835,000 according to the documents that Diane Manns filed with [W]ilshire [H]ouse on May 5, 2014[,] along with other documents[,] for your review and documentation. [¶] . . . [¶] We have contacted listing agent Diane Manns again to visit [U]nit 704 however, she has flatly rejected to show the unit which jeopardize[s] her license. I hope . . . she realize[s] that this is part her duty as a listing agent otherwise she has to face consequences." Notwithstanding repeated references to Manns, Kashani's email does not indicate that he agreed to use Manns as his agent in the transaction.

According to paragraph 7 of Kashani declaration, at 11:18 p.m., he delivered the deposit check and a copy of the 9:31 p.m. email and attachments to Gerowitz's office. Kashani

appended the 11:18 p.m. submission to his declaration as exhibit 14. Exhibit 14 is labeled with a WHA prefix, and Kashani contends that WHA produced these documents in the litigation. Both exhibits 13 and 14 include (1) Kashani's 9:31 p.m. email; (2) Kashani's letter of intention, indicating he wished to use his sister as his agent, which was not modified to strike out or retract this statement; (3) a copy of the May 5, 2014 Agent Information document signed by Kashani; (4) a copy of the deposit check; and (5) a corrected first page to the purchase and sale agreement in which Soltani Family Trust was crossed out as the buyer and Kashani's name written in.

On May 22, 2014, at 11:02 p.m., Kashani's sister sent an email to Manns with a carbon copy to Gerowitz. In her email, she complained that Manns would not show her and her brother Unit 704 and stated, "Just [to] let you know I am representing my brother Moussa Kashani in this deal and I am buyer's agent and have to get my commission of 2.5[ percent] from the seller." Yasmin forwarded this email to her brother the next day at 5:00 p.m. During her deposition, Yasmin could not recall whether Kashani advised her before or after she sent the 11:02 p.m. email that she could not represent him in the transaction. In discovery, Kashani referred to an email from his sister to Manns as "an unauthorized e-mail."

**D.  WHA Determines Cantor's Submission Complies with the CC&Rs and Kashani's Does Not**

The next day, May 23, 2014 at 6:31 a.m., Gerowitz sent an email to Rabkin in which she stated "I needed Mr. Kashani to hear the rules directly from you. [¶] He sat in my office and cross out signatures, signed his own and gave me the paperwork. He did not white-out the prior buyer's name so it basically has

9

'Soltani Family Trust' as the buyer and Moussa Kashani as the signer. [¶] I will be calling in the morning, requesting that you review both executed contracts in order to approve them as appropriate for the name draw. Of course, if one is deemed invalid, it goes to the other by default. [¶] And just as a point of interest, I am attaching the letter Mr. Kashani's sister, Yasmin, sent to the unit broker." During her deposition, Gerowitz testified that she got Kashani's check, put it with "the other stuff" and took both Cantor's and Kashani's submissions to Rabkin.

During his deposition, Rabkin testified he did not receive the corrected first page of the purchase and sale agreement as part of Kashani's submission.

On May 23, 2014, at 11:59 a.m., Rabkin sent an email to Gerowitz in which he stated that in his opinion, "Andres Cantor has complied with the exercise of the right of first refusal to the letter requirement[s] of the CC&Rs, and Moussa Kashani has failed to do so. . . . [¶] . . . [¶] The documents submitted by Andres Cantor are 'identical' to the original offer in ALL respects, except that he has whited out every reference to the original buyer, and placed his name in each such location. Every buyer signature has been replaced by his; every buyer initial has been replaced by his. Mr. Cantor has strictly complied with the requirements and so qualified to be the buyer of the unit, under the [r]ight of [f]irst [r]efusal language. [¶] Mr. Kashani, on the other hand, has submitted a copy of the original offer, where he simply signed his name by SOME but not all of the purchase documents, and he has left the original buyer's name and signature (Soltani Family Trust) throughout the document as the buyer of the unit. Please remember, the CC&Rs say that the one required change is 'the name of the [o]wner making the offer.'

10

While his intent is clear, he hasn't followed the letter of the CC&Rs, and the CC&Rs give the [B]oard no latitude here, since they say 'any attempt to exercise the [r]ight of [f]irst [r]efusal shall be invalid and unenforceable unless . . . in the following manner' which wasn't done here. Lastly, Mr. Kashani submitted a cover letter with his offer stating that the broker under the agreement would be his sister . . . , which is a change in the terms of the original offer, which states that the broker is Diane Manns of Coldwell Banker. [¶] Therefore, you should advise the unit owner that Mr. Cantor is the buyer of the unit, and advise Mr. Kashani that he is not."

Gerowitz testified that she was not involved in determining whether the offers complied with the CC&Rs other than providing the paperwork to Rabkin.

It is undisputed that on or about May 29, 2014, Cantor completed his purchase of Unit 704.

## E. Kashani Alleges Causes of Action for Breach of Contract and Fraud Against WHA

In September 2014, Kashani initiated this lawsuit. In May 2016, Kashani filed a first amended complaint against WHA, Cantor, Dr. David Cantor,[2] the individual successor trustees of the Geldin Family Trust, and Gerowitz. Following several voluntary requests for dismissal, only Kashani's causes of action against WHA for breach of the CC&Rs and fraud remained.

In his cause of action for breach of the CC&Rs, Kashani alleged that he "timely submitted his properly drafted [right of

---

[2] Dr. David Cantor is not listed on the caption page as a defendant, however, Kashani brought the sixth cause of action for breach of fiduciary duty against him.

11

first refusal] and acceptance of the [purchase and sale agreement] to purchase [Unit 704] pursuant to the CC&Rs" and performed all his obligations. He further alleged WHA breached section 17 of the CC&Rs by refusing to sell Unit 704 to Kashani and instead allowing Cantor to purchase the property "to the exclusion of [Kashani]." As a result, Kashani claimed he suffered damages according to proof, but not less than $700,000.

In his cause of action for fraud, Kashani alleged that "WHA, through its [g]eneral [m]anager, [defendant] Gerowitz," falsely represented to Kashani how to prepare and submit a proper right of first refusal and written acceptance of the purchase and sale agreement and that his right of first refusal and acceptance of the purchase and sale agreement were submitted in proper form and substance pursuant to the CC&Rs. "More specifically, . . . Gerowitz told [Kashani] that it was proper for him to simply cross out each instance in which the name of Soltan[i] Family Trust appeared on the [purchase and sale agreement], to write and initial [Kashani's] name next to each such instance, and then cross out the signature for Soltan[i] Family Trust at the end of the [purchase and sale agreement] and sign the [purchase and sale agreement] himself."

Kashani further alleged the representation "was in fact false and known by [WHA and Gerowitz] to be false when made in that . . . WHA and Gerowitz now claim that [Kashani's right of first refusal] was improperly formatted for doing the very things they told him to do"; that he justifiably relied upon the alleged misrepresentations in submitting his offer to purchase Unit 704; that at the time the representations were made he did not know nor reasonably could have known the representations were false and that if he had known they were false, he "would have

12

corrected his [right of first refusal] and written acceptance of the [purchase and sale agreement] and submitted them in the proper form." Kashani again claimed at least $700,000 in damages and sought punitive damages.

## F.     Kashani's Discovery Responses Relevant to this Appeal

Approximately three and a half years into the litigation, Kashani served discovery responses in which he acknowledged his offer contained flaws and repeatedly stated that WHA had an obligation to conduct a random drawing. For example, to special interrogatory number 19, Kashani stated, "The CC&R[s] require there to be a random draw if there are competing offers to exercise the right of first refusal. There were two competing offers with similar, if not the same, flaws. Yet one, specifically, [Kashani's], was rejected as improper and WHA failed to conduct the random draw." Kashani insisted WHA should have conducted a random drawing in at least three more interrogatory responses.

In response to a special interrogatory that asked for all facts supporting Kashani's allegation that he properly exercised his right of first refusal, Kashani responded that Gerowitz and Rabkin "instructed [Kashani] to initial and sign everywhere the buyer signed. [Kashani] did so and gave the offer to Ms. Gerowitz. Ms. Gerowitz reviewed the offer page by page and approved [Kashani]'s offer. She then told him that his offer is accepted, specifically, she told him, 'you're in' and then instructed him to drop off the deposit check."

WHA also asked Kashani to admit that in his offer submitted on May 22, 2014, he "did not cross out the name of the original buyer Soltani Family Trust as the buyer." Kashani

responded, "Neither admit or deny." In explaining this response, Kashani stated he "crossed out *the signature* of the original buyer Soltani Family Trust where it appeared on the [p]urchase and [s]ale [a]greement," leaving the question of whether he crossed out the name of the buyer unaddressed. (Italics added.)

Notwithstanding that the interrogatories posed to Kashani followed the format of asking him to "state all facts," none of Kashani's discovery responses describes his later submission of the corrected first page of the purchase and sale agreement.

As to damages, Kashani stated in discovery responses that his damages consisted of lost profits from the difference between the purchase price of Unit 704 and the fair market value of the unit or rent of Unit 704. Kashani affirmed that there were no other damages.

As to Cantor's attempt to exercise his right of first refusal, Kashani consistently stated in discovery that Cantor's offer contained flaws or defects.

## G. WHA's Motion for Summary Judgment

On June 28, 2018, WHA moved for summary judgment. WHA argued that Kashani could not establish that he performed as required under section 17 of the CC&Rs because his right of first refusal offer was flawed and Kashani admitted in discovery responses that his offer was flawed. Moreover, WHA argued, Kashani could not establish causation or damages for either his breach of contract or fraud causes of action. The only damages Kashani claims to have suffered were lost profits, which WHA argued must be proven as certain not only as to the amount, but as to their occurrence. Kashani could not do so because Kashani would have, at best, a 50 percent chance of winning the random draw. WHA also argued that the business judgment rule, based

14

in WHA's decision to follow the advice of its attorney, insulated WHA from any liability.

In his opposition to the motion for summary judgment, Kashani argued issues of material fact exist as to, among other things, whether his offer complied with section 17 of the CC&Rs and whether Cantor's offer complied with section 17. Kashani concluded, "[t]hus, *there would be no random drawing* because [Kashani's] offer would have to be accepted as the only offer to properly exercise the right of first refusal under the CC&R's." (Italics added.)

In response to WHA's proposed undisputed material facts that Kashani's offer did not comply with section 17, Kashani's offer was defective and flawed, and that Kashani alleged that his offer contained the same flaws as Cantor's offer, Kashani cited paragraphs 4, 6 and 7 of his declaration and exhibits 13 and 14 thereto.[3] As we already described, Kashani stated in paragraphs 6 and 7 that he submitted a corrected first page of the purchase and sale agreement in which he crossed out the Soltani Family Trust and wrote in his name.[4] According to paragraph 4 of his

---

[3] Kashani also cites WHA's May 7, 2014 notice letter attaching the original purchase agreement with the Soltani Family Trust as buyer, Cantor's executed documents to exercise his right of first refusal, Kashani's executed documents to exercise his right of first refusal, and Rabin's deposition testimony that he was not aware that Kashani corrected the offer from the Soltani Family Trust to his name. None of this evidence tends to prove Kashani properly exercised his right of first refusal.

[4] Kashani did not provide an explanation in his declaration as to why his discovery responses never referred to his correction to the first page of the purchase and sale agreement.

declaration, when Gerowitz advised Kashani that he must use Manns as his broker, Kashani stated "I told Ms. Gerowitz that I would agree to do [so]."

In its reply, WHA argued that Kashani was bound by his prior discovery responses that his offer was flawed and that a random drawing was required. Kashani could not contradict such responses to avoid summary judgment. WHA also objected to certain evidence that Kashani submitted with his opposition, including paragraphs 6 and 7 of his declaration and exhibits 13 and 14 thereto, on the basis that it was being used to contradict Kashani's prior discovery responses.

The trial court granted WHA's motion for summary judgment. The trial court determined that, "[E]ven assuming [Kashani's] bid was compliant, [Kashani] would only be entitled to *participate in the random drawing*. . . . As a matter of simple math, [Kashani] had no better than a 50[ percent] chance to win the draw and he cannot establish that his victory was more probable than not. . . . [¶] Moreover, it is well settled that contract damages must be certain. [Citation.]" (Fn. omitted.)

The trial court also addressed Kashani's arguments in his opposition that a random drawing was not required: "For the first time, [Kashani] contends that his offer was the *only offer* to comply with the [CC&Rs]. . . . Therefore, WHA was not obliged to perform the random draw and should have been deemed the buyer of the unit outright. [¶] It is well-established that 'a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses.' (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12 . . . .) . . . [¶] [Kashani] has consistently maintained that there were two competing offers and that WHA should have conducted a random drawing between [Kashani] and

16

Cantor to determine who would win the right to purchase Unit [7]04. . . . [Kashani] cannot sidestep the random-drawing issue by proffering a new, eleventh-hour theory for recovery. It remains undisputed that, at best, [Kashani] was entitled to participate in a random draw for the chance to own Unit 704." As to the fraud claim, the trial court stated, "The same analysis applies equally to the fraud claim."

On October 17, 2018, the trial court entered judgment in favor of WHA and awarded attorneys' fees and costs, in an amount to be determined, to WHA. Kashani timely appealed the judgment.

## H.     Attorneys' Fees and Costs, Including Expert Fees

After entry of judgment, WHA sought attorneys' fees in the amount of $198,942 and costs, excluding expert witness fees, in the amount of $9,668.02. WHA contended it was entitled to such fees as the prevailing party pursuant to an attorneys' fees provision in the CC&Rs. Specifically, section 19.3 of the CC&Rs state, "In the event the Board or any [o]wner or [o]wners shall bring legal action to enforce the terms, covenants, conditions and restrictions of [the CC&Rs], the court shall award reasonable attorneys fees and court costs to the prevailing party."

WHA also argued it was entitled to expert witness fees in the amount of $2,195 under Code of Civil Procedure section 998, subdivision (c). WHA provided an offer to compromise to Kashani on May 5, 2015. Kashani did not accept the offer.

Following briefing and oral argument, the trial court awarded to WHA attorneys' fees in the amount of $180,442; the costs requested less certain appearance fees, a duplicate

17

telephone appearance fee, and hotel costs for mediation;[5] and expert witness fees in the amount of $2,195.

## DISCUSSION

### A.    Standard of Review

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).)  A defendant seeking summary judgment has met the "burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (*Id*., subd. (p)(2).)  Once the defendant has met that burden, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Ibid*.)

We review the trial court's summary judgment rulings de novo.  In doing so, we liberally construe the plaintiff's evidentiary submission while strictly scrutinizing the defendant's own showing, and resolve any evidentiary doubts or ambiguities in the plaintiff's favor.  (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1083, citing *Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1438.)  However, "when discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be tried, certain of those stern requirements

_____

[5] Neither the trial court's ruling nor the parties' briefs states the exact amount awarded for costs.

18

applicable in a normal case are relaxed or altered in their operation." (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 (*D'Amico*).)

## B. Summary Judgment of Kashani's Cause of Action for Breach of the CC&Rs Is Proper

"[A] party cannot create an issue of [material] fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn, supra*, 42 Cal.4th at p. 500, fn. 12.) "In determining whether any triable issue of material fact exists, the trial court may give 'great weight' to admissions made in discovery and 'disregard contradictory and self-serving affidavits of the party.' [Citation.]" (*Whitmire v. Ingersoll-Rand Co., supra*, 184 Cal.App.4th at p. 1087.) "Our Supreme Court has explained that such admissions 'have a very high credibility value,' particularly when they are 'obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts.' [Citation.] . . . Where a declaration submitted in opposition to a motion for summary judgment clearly contradicts the declarant's earlier deposition testimony or discovery responses, the trial court may fairly disregard the declaration and ' "conclude there is no *substantial* evidence of the existence of a triable issue of fact." ' [Citation.]" (*Ibid.*, citing *D'Amico, supra*, 11 Cal.3d at pp. 21, 22.)

On appeal, Kashani argues whether a random drawing should take place depends upon first determining which, if any, of the submitted offers complied with the CC&Rs. Further, Kashani argues his declaration did not mention, let alone contradict his earlier discovery responses on, the issue of whether Cantor's offer complied with the CC&Rs. Nor does his declaration or first amended complaint mention the issue of a

19

random drawing.  Thus, Kashani concludes the trial court improperly disregarded his argument that a random drawing was not required based on the principle articulated in *D'Amico*, *supra*, 11 Cal.3d at pages 21, 22 and *Shin v. Ahn*, *supra*, 42 Cal.4th at page 500, footnote 12.

We agree that *D'Amico* and its progeny apply only when a party submits a declaration or affidavit that clearly contradicts prior statements made in discovery.  (*See Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521 ["Properly applied, *D'Amico* is limited to instances where 'credible [discovery] admissions . . . [are] contradicted only by self-serving declarations of a party' " (italics omitted)].)  We further agree that Kashani has consistently stated in discovery that Cantor's offer was defective, that Kashani did not contradict this position in his declaration, and that Kashani does not refer to the issue of random drawing in his declaration.  Accordingly, the principle articulated in *D'Amico* does not apply to the issues of Cantor's compliance and the random drawing.  However, we conclude the trial court properly granted summary judgment as to both Kashani's breach of contract and fraud claims.[6]

"To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186.)

---

[6] On summary judgment, we may affirm the trial court's ruling on any correct legal theory as long as the parties have adequately addressed the theory in the trial court.  (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.)

Kashani cannot demonstrate the second element that he performed under the contract because the evidence supports only one conclusion: Kashani's offer did not comply with the CC&Rs.

Kashani admits in his interrogatory responses that his submission contained flaws. This concession is further supported by Kashani's failure to deny a request for admission that he did not cross out the name of the buyer Soltani Family Trust and his form interrogatory response explaining that he crossed out the *signature*, impliedly conceding he did not cross out each instance of the name of the buyer.

Kashani attempts to contradict his concession that his submission was flawed in paragraphs 6 and 7 of his declaration and exhibits 13 and 14 thereto by describing his correction to the *first page* of the purchase and sale agreement. We need not address whether these paragraphs may be properly disregarded pursuant to *D'Amico*.[7] Even if they are taken as true, Kashani's submission still failed to comply with the CC&Rs.

First, "any notice or communication . . . required by [the CC&Rs] shall be in writing." Kashani's written submission delivered to Gerowitz unequivocally modified the terms of the original purchase and sale agreement by stating that his sister would serve as his agent. He did not make any written correction to this submission to indicate a change in his position. Instead, he submitted this letter without modification on two more occasions to WHA on the night of May 22, 2014, despite having

---

[7] At the hearing on the motion for summary judgment, the trial court stated "For the most part I would probably overrule [WHA's] objections[, including to paragraphs 6 and 7 and exhibits 13 and 14]. I think that's what my ruling is."

21

been advised he must use Manns as his broker.  Nor did Kashani correct, in writing, the 5:18 p.m. email from his sister to Gerowitz on which he was copied that stated he wanted his sister to serve as his agent.  Nor did Kashani state in his 9:31 p.m. email that he agreed to having Manns act as his agent notwithstanding that he referred to Manns at least twice in that communication, complaining that she was not doing her job and would have to face the consequences.

At oral argument, Kashani contended that he did agree in writing to Manns acting as his agent.  Kashani points to the first page of the purchase and sale agreement that indicates, among several other contract terms, that the buyer and seller agree to Coldwell Banker as their agent.  He argued his re-submission of this page at 9:31 p.m. and 11:18 p.m. constitutes an agreement in writing to use Coldwell Banker as his agent.  Kashani ignores, however, that at 9:31 p.m. and 11:18 p.m., he also submitted his cover letter in which he specifically sought to modify this term to use his sister as his agent.  Indeed, on the issue of using Manns as his agent, his re-submission did not differ in any respect from his original written submission which was flawed in this respect.

Second, reasonable minds cannot differ that notwithstanding Kashani's single correction to the first page of the purchase and sale agreement, he still failed to cross out the name of the buyer in at least two more instances.[8]  (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519 [acknowledging what may

---

[8] Specifically, Kashani did not cross out the name of the buyer for the Wood Destroying Pest Inspection and Allocation of Cost Addendum or for the "For Your Protection: Get a Home Inspection" form.

ordinarily be a question of fact on summary judgment may be resolved as a matter of law when reasonable minds could not differ as to the legal effect of the evidence presented]).  Indeed, Kashani impliedly concedes he did not cross out the buyer's name on these pages in his reply brief.  Because Kashani has failed to identify a disputed issue of material fact as to his lack of compliance with the CC&Rs, whether Cantor's submission complied is moot.

## C.    The Trial Court Properly Granted Summary Judgment of Kashani's Cause of Action for Fraud

Kashani alleged WHA made two misrepresentations.  First, Gerowitz[9] told him how to exercise his right of first refusal.  Second, Gerowitz told him that he was "in," which Kashani interpreted to mean that his offer was acceptable.[10]  Kashani also alleges that had he known the truth, he would have corrected his submission.

As a preliminary matter, we note the parties' arguments relating to Kashani's fraud claim are underdeveloped and problematic.  For example, given the nature of Kashani's fraud allegations, it logically follows that in order to prevail on his fraud claim, it must be presumed that Kashani's submission *did not* comply with the CC&Rs and, thus, he would have never been

---

[9] While Kashani contends in the general allegations of his first amended complaint that attorney Rabkin also advised him how to exercise his right of first refusal, in his cause of action for fraud, Kashani alleges that only Gerowitz made false statements.

[10] We observe that such a statement could have meant only that Kashani submitted his paperwork, sans deposit check, within the required time.

23

eligible for a random drawing. However, neither Kashani nor WHA takes this position in their briefs, even as an argument in the alternative. Rather, Kashani and WHA advance the same arguments they made with respect to Kashani's breach of contract cause of action.

"[W]e 'must presume the judgment is correct, and the appellant bears the burden of demonstrating error.' [Citation.]" (*Tubbs v. Berkowitz* (2020) 47 Cal.App.5th 548, 554.) An appellant who does not develop arguments risks waiving them on appeal. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862-863.) Even accepting Kashani's underdeveloped fraud arguments, however, we still conclude the trial court properly granted summary judgment because Kashani cannot demonstrate a dispute of material fact as to causation.

As to the first alleged fraudulent statement, it is unclear what Kashani contends is false. Kashani claims Gerowitz advised him, "simply cross out each instance in which the name of Soltan[i] Family Trust appeared on the [purchase and sale agreement], to write and initial [Kashani's] name next to each such instance, and then cross out the signature for Soltan[i] Family Trust at the end of the [purchase and sale agreement] and sign the [purchase and sale agreement] himself." As described above, however, Kashani did not follow these instructions because he failed to cross out the name of the buyer in at least two instances. Accordingly, Kashani cannot establish this statement was a substantial cause of his alleged damages.

As to the second alleged misrepresentation that Kashani was "in," we conclude Kashani cannot establish causation as a matter of law. "A plaintiff who has access to the necessary information and actually makes an independent investigation

24

that the defendant does not hinder will be charged with knowledge of the facts that reasonable diligence would have disclosed and cannot claim reliance on the representations." (5 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 930.)

Here, Kashani admits that between the time that Gerowitz advised him that he was "in" and the time he delivered the deposit check several hours later, Kashani reviewed his submission and discovered a mistake. Kashani further admits facts that demonstrate he was a sophisticated party to the transaction: Kashani had been a real estate investor for 28 years and had purchased units at Wilshire House on two prior occasions through the right of first refusal procedure. Thus, there is no question that reasonable diligence would have revealed to him that his offer did not comply by both failing to agree unequivocally and in writing to use Manns as his agent and failing to cross out at least two instances of Soltani Family Trust and write in his own name. There is no evidence in the record that WHA hindered Kashani from exercising such diligence.

We also observe the record supports another reason to affirm the trial court's ruling as to the fraud cause of action. In its separate statement and by the evidence cited therein, WHA advances an argument that Gerowitz's alleged misrepresentations may not be attributed to WHA. Specifically, WHA contended that "WHA provided its attorney Michael Rabkin with the [r]ight of [f]irst [r]efusal offers from [Kashani] and Cantor for review to determine compliance with Section 17." In support of this fact, WHA cites Gerowitz's deposition testimony that she was not involved in the determination of whether the offers complied; that was for Rabkin to determine. In his response to WHA's separate statement, Kashani disputed

25

this fact only on the basis that Gerowitz allegedly did not deliver his corrected first page of the purchase and sale agreement to Rabkin. He did not cite any evidence to contradict WHA's statement.

WHA also contends in another two facts that Kashani "does not allege that any WHA director made any false representations to him" and that Kashani "had no interaction with any WHA director regarding his offer." Kashani does not dispute that he did not speak directly with a director. Rather, to each of these facts, Kashani responds that Gerowitz was WHA's *agent*. But Kashani does not cite evidence sufficient to create a disputed issue of material fact that Gerowitz's statements were within the scope of her agency. At oral argument, Kashani argued the following evidence established agency: Gerowitz sent notice to the owners that they could exercise their right of first refusal; Gerowitz collected the submissions; Gerowitz knew to call Rabkin for advice as to how Kashani should complete his submission; and Gerowitz communicated to Kashani the determination that his offer did not comply with the CC&Rs. This evidence demonstrates only that Gerowitz acted in an administrative role for WHA.[11]

---

[11] Ostensible authority exists when a principal, "intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317.) While a person may act as an agent for certain purposes, he may not have authority to act as the principal's agent for others. (See Rest.3d Agency, § 1.01, com. a ["Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or *to transmit or receive information on their behalf*" (italics added)].)

Moreover, the evidence in the record establishes that advising Kashani whether his offer complied with the CC&Rs was not within the scope of Gerowitz's agency.[12] During her deposition, Gerowitz unwaveringly testified that she was not involved in the determination of whether the right of first refusal submissions complied with the CC&Rs. Rather, Rabkin was tasked with deciding whether the submissions complied with the CC&Rs. WHA's May 7, 2014 notice, signed by Gerowitz, supports this description of Gerowitz's duties: it advised its recipients of their opportunity to exercise their right of first refusal and directed them to *refer to the CC&Rs* for additional information.

Also, Kashani acknowledges that when he asked Gerowitz how to exercise the right of first refusal, she did not answer the question by herself. Rather, she contacted WHA's attorney, Rabkin, to provide that information directly to Kashani, thereby indicating to Kashani that such knowledge was not within her purview. Indeed, she emailed Rabkin that she needed Kashani to hear the rules directly from him and told Kashani "a couple of times that [she] was unable to assist him in filling it out."

Further, as described above, Kashani concedes that even though Gerowitz reviewed his submission, he thereafter identified an error on the first page of the purchase and sale agreement while preparing the deposit check. To the extent he actually believed at the time that Gerowitz's representations

---

[12] The existence or scope of an agency relationship is ordinarily a question of fact. However, "summary judgment is appropriate where, as here, the evidence is undisputed and susceptible of but a single inference." (*Universal Bank v. Lawyers Title Ins. Corp.* (1997) 62 Cal.App.4th 1062, 1066; see *Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 536.)

were made in the scope of her agency, the discovery of this error—in addition to the other facts stated above—render it unreasonable for him to have believed so.

Given our ruling, Kashani's argument that he may seek nominal damages is moot as is WHA's argument that the business judgment rule or reliance on advice of its attorney shields it from liability.

## D. The Trial Court Did Not Abuse Its Discretion in Awarding Certain Attorneys' Fees and Costs

Although Kashani appeals from only the trial court's October 17, 2018 judgment, we have jurisdiction to consider the trial court's later award of specific amounts of attorneys' fees and costs except for costs awarded as a result of WHA's Code of Civil Procedure section 998 offer to compromise. " '[W]hen a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award.' " (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1316, quoting *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998.) "[T]he determination of the amount of the award is 'not a collateral matter unrelated to the judgment's validity and finality,' but 'in essence defines the scope of the judgment itself.' [Citation.]" (*Pfeifer*, *supra*, at pp. 1316-1317.) However, " '[a]n award of expert witness fees pursuant to [Code of Civil Procedure] section 998 is not incidental to the judgment but is instead a separately litigated issue. [Citation.] Prevailing parties do not recover their expert witness fees as a matter of right. When the opposing party has rejected a settlement offer and fails to obtain a more favorable judgment, the trial court may, in its discretion, make an award of expert witness fees.

28

[Citation.] . . . Because expert witness fees are not incidental to the judgment, the propriety of a postjudgment award of expert witness fees cannot be reviewed on an appeal from the judgment.' [Citation.]" (*Id*. at p. 1317, quoting *Fish v. Guevara* (1993) 12 Cal.App.4th 142, 148.)

Kashani contends the trial court abused its discretion in awarding certain attorneys' fees and costs. "An abuse of discretion is shown when the award shocks the conscience or is not supported by the evidence." (*Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542, 549-550.) Kashani argues the award for fees should be reduced by $30,924 for (1) billings for attending depositions that did not take place; (2) billings for trial preparation after the motions for summary judgment was granted; (3) billings for services rendered regarding other defendants; and (4) billings that were not adequately described.

WHA contends that the trial court reflected its consideration of these concerns in reducing the award for attorneys' fees by $18,500. We agree. The trial court's ruling states it heard argument relating to Kashani's concerns, reviewed the parties' briefs, and reduced the attorneys' fees award by $18,500. Based upon our review, the billings relating to attending depositions "that did not take place" totaled $8,000; billings relating to trial preparation after the grant of summary judgment totaled approximately $2,000; and fees in the third and fourth categories are not clearly only for the benefit of other defendants and are not necessarily inadequately described. Accordingly, we find the trial court did not abuse its discretion in awarding attorneys' fees in the amount of $180,442.

Kashani also contends the trial court should not have awarded costs for certain filing fees, messenger costs, telephonic

29

appearances, and expert witness fees.  Code of Civil Procedure section 1033.5 provides the court discretion to award costs not expressly listed therein, and we find no abuse of discretion relating to the filing fees, messenger costs, or telephonic appearance fees awarded by the trial court.  As to the cost relating to expert fees awarded pursuant to Code of Civil Procedure section 998, we are without jurisdiction to review such fees.  (*Pfeifer v. John Crane, Inc.*, *supra*, 220 Cal.App.4th at pp. 1316-1317.)

## DISPOSITION

The judgment is affirmed.  WHA is to recover its costs on appeal.

NOT TO BE PUBLISHED

SINANIAN, J.*

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.