Filed 8/18/21  Pak v. Github, Inc. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| AGNES PAK,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>GITHUB, INC.,<br><br>　　　Defendant and Respondent. | A159585<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-18-570177) |

Agnes Pak (Pak) sued her former employer, Github, Inc. (Github) under California's Equal Pay Act (EPA), asserting claims for unequal pay and for retaliation.  She appeals from a defense summary judgment.  We affirm.

## BACKGROUND

Pak was employed as the associate general counsel at Github for 11 months.  Before she accepted the position, she twice negotiated the offered compensation package upwards, before accepting the offer of $255,000 in salary, a $15,000 bonus, and 85,000 shares of stock.  She signed an at-will employment agreement reflecting that compensation.  She also negotiated that she would report to the general counsel, Julio Avalos, rather than to Tal Niv, then the vice-president, law and policy, as originally planned.

Prior to being hired as associate general counsel, Pak had been searching for a job after being terminated from a general counsel position at

ClearCare, Inc.  After being told by a GitHub employee she knew that GitHub's general counsel, Julio Avalos, was a "great guy . . . incredibly smart, insightful and a great boss," Pak spoke with Avalos about working for GitHub.

Avalos asked Pak to draft a job specification for her proposed role to include "corporate work, stock admin, all of the commercial paper, international subs, etc."  Pak drafted a job specification for a "VP Legal/GC role."  Avalos responded that he was "green-lighting the creation of the new senior role to oversee the transactional and corporate side of the house.  Once that job spec is final and live, we'll reach out."  He noted, however, the role would be an associate general counsel position, not a VP legal/general counsel position.  Avalos explained "Your write-up had assumed a VP Legal/GC role, but as we discussed at our last meeting, and given our recent hiring of a CFO and my upcoming de-occupation of Finance, the CEO and I have been assuming an AGC position.  The position will almost certainly be scoped in that way, which may well change your thinking about it."  Pak replied she had no objection to that narrowed role, stating "I would be totally okay with the AGC title and the somewhat narrowed scope of duties to corporate and transactional matters-it will give me the ability to focus on some of your more immediate needs. . . .  I think there is a lot that I can contribute, regardless of title."

In January 2017, Avalos told Pak GitHub was interviewing internal candidates for the "AGC-Corporate & Transactional group position," and he would decide whether to interview external candidates.  He then offered Pak a short-term contract attorney position.  Pak accepted and worked in the contract role from February to May 31, 2017.

In April 2017, GitHub offered Pak an associate general counsel position with a focus on " 'corporate, commercial, and transactional law.' "  Pak recognized the position "had been scoped at a Senior Director level," and that she was not being hired for a general counsel role.

After negotiating a higher compensation package, Pak almost immediately began complaining to Avalos on numerous occasions that her compensation was low.  She asserted she should be paid commensurate with vice-presidents at the company.  Pak claimed she raised the issue of increasing her compensation in every one-on-one meeting with Avalos.

Avalos reviewed Pak's 2017 performance in early 2018.  Although he praised her performance in some areas, he also had serious criticisms.  These included her failure to work cooperatively with others in the legal department, leading to "schisms . . . a feeling of balkanization, factions, and, in some cases, outright toxicity."  He also noted her "understanding of product and company systems lags behind," she had "moments of indiscretion with stakeholders outside of the organization," "stepp[ed] into areas that are not under her scope and confus[ed] teams and procedures," and she lacked "attention to detail on non-transactional issues (objectively wrong black letter law advice to Talent Acquisition)."

Pak was still given a "small raise to $262,650" and a $7,500 bonus.  She claimed Avalos promised to make the salary increase retroactive to June 1, which he denied.  When her paystub did not reflect a retroactive pay increase, she sent an e-mail to HR, stating in part:  " 'Am I being constructively terminated?  I've been working in a job for which the company is not paying me for and has not been right sized-I've been complaining since last year.  I have no desire to continue to work being paid significantly below

my contribution. Let's talk about a package so I can move on. . . ." (Boldface and underscoring omitted.)

The HR department set up a meeting between Pak and Avalos for the following week. After the meeting was rescheduled, Pak told her direct reports and others she was on a " 'work strike' " "until [Avalos] either gives me a raise or fires me (and packages me out)." She stayed out for a full week, although she claimed she "stayed home and worked." Pak had imposed a no vacation policy on her own team for the final week of the quarter because " 'timely legal assistance for the deal flow was important.' "

Avalos considered terminating Pak when he learned of her work strike, but he decided to give her a chance to explain her behavior. Prior to their meeting he sent her an e-mail reviewing her performance and noting the areas of concern.

At their meeting, Avalos noted his feedback on Pak's performance, and said he did not think Pak could be happy at GitHub. Pak replied she could be happy if she were paid "fairly." Pak claims Avalos explained he was not going to pay her " 'what you think you're worth,' " that GitHub's pay surveys showed she was being paid fairly, and that Pak was not going to be paid a VP level salary. Pak replied, " 'Great. So what stock number are we talking about.' " Avalos stated he could not "simply give her stock."

Pak claimed Avalos ended the meeting by saying, " 'All of this complaining about compensation and head count is unprofessional. And I can't have it from my legal person,' " and HR should "package her out." April 24, 2018 was Pak's last day of employment with GitHub.

Pak then sued GitHub for violations of the EPA, alleging she received less compensation than Niv or Avalos. Seven months later, she filed an

4

amended complaint adding a cause of action for retaliation for allegedly making complaints about unequal pay under the EPA.

## DISCUSSION

### *Standard of Review*

Our standard of review of a grant of summary judgment is well-settled. "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

"A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his or her pleadings, 'but, instead, shall set forth the specific facts showing that a triable issue of material fact exists. . . .' [Citation.] A triable issue of material fact exists 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .' " (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 864, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a

5

reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) "A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.) "Moreover, plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*King v. United Parcel Service, Inc.*, at p. 433.)

### The Equal Pay Claim

The California EPA provides in pertinent part: "(a) An employer shall not pay any of its employees at wage rates less than the rates paid to employees of the opposite sex [or another race or ethnicity] for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions, except where the employer demonstrates: (1) The wage differential is based upon one or more of the following factors: (A) A seniority system. (B) A merit system. (C) A system that measures earnings by quantity or quality of production. (D) A bona fide factor other than sex, such as education, training, or experience." (Lab. Code, § 1197.5, subd. (a)(1)(A)-(D).)

"The EPA exists to ensure that employees performing equal work are paid equal wages without regard to gender. To prove a violation of that basic principle, a plaintiff must establish that, based on gender [race, or ethnicity], the employer pays different wages to employees doing substantially similar work under substantially similar conditions. If that prima facie showing is made, the burden shifts to the employer to prove the disparity is permitted by

6

one of the EPA's statutory exceptions. . . . If an exception is established, the burden shifts back to the plaintiff to prove pretext." (*Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 323–324 (*Hall*), fn. omitted.) There is no requirement a plaintiff show discriminatory intent as an element of the claim. (*Green v. Par Pools, Inc.* (2003) 111 Cal.App.4th 620, 622–625, 629 (*Green*).)

"[I]n order for a plaintiff initially to establish a prima facie case under the Equal Pay Act, she must show not only that she is being paid lower wages than her . . . comparator, but also that she is performing work substantially equal in skill, effort, and responsibility to her comparator under similar working conditions; i.e. the . . . comparator must be properly selected." (*Strag v. Board of Trustees* (4th Cir. 1995) 55 F.3d 943, 950 (*Strag*), italics omitted.)

### *The Applicable EPA Standard*

Pak claims 2016 amendments to California's EPA impose "more rigorous standards for employers" than the standards under the federal EPA, and the trial court therefore erred in relying on federal authorities in considering Github's motion for summary judgment.[1]

As Pak points out, as amended by the 2016 legislation, the pertinent inquiry under the state EPA is whether the plaintiff was paid less "for substantially similar work when *viewed as a composite of skill, effort and responsibility*." (Lab. Code, § 1197.5, subd. (b), italics added.)

The federal statute provides in pertinent part: "No employer having employees subject to any provisions of this section shall discriminate, within

---

[1] "Gender-based discrimination in rates of pay to employees, whether male or female, is prohibited by the Equal Pay Act of 1963, which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d)." (*Miranda v. B & B Cash Grocery Store, Inc.* (11th Cir. 1992) 975 F.2d 1518, 1526.)

7

any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires *equal skill, effort, and responsibility*, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . ."  (29 U.S.C.S. § 206(d)(1), italics added.)

Although the federal statute uses the phrase "equal skill, effort, and responsibility," cases applying the statute have explained "although [a plaintiff] need not show that the jobs are identical, [he or she] must demonstrate 'that [he or she] performed substantially similar work for less pay.' "  (*Heatherly v. University of Alabama Board of Trustees* (11th Cir. 2019) 778 Fed.Appx. 690, 692.)  And whether the work is "substantially similar" is determined by whether the job " 'require[d] substantially similar skill, effort and responsibilities, and . . . was performed under similar working conditions.' "  (*David v. Board of Trustees of Community College District No. 508* (7th Cir. 2017) 846 F.3d 216, 230.)

California cases decided prior to the 2016 amendment generally relied on the federal courts' interpretation of the federal EPA.  "Because Labor Code section 1197.5 is substantively indistinguishable from its federal counterpart, California's court rely on federal authorities construing the federal statute." (*Hall, supra,* 148 Cal.App.4th at p. 323, fn. 4; see *Green, supra,* 111 Cal.App.4th at p. 623.)

The trial court therefore concluded "the change in the operative language [of Labor Code section 1197.5] did not materially alter the definition of 'equal work' or the analysis of that issue reflected in prior state and federal cases. (Compare Stats. 2015, ch. 546, § 2 ['substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working condition'] with former Lab[or] Code § 1197.5(a) ['equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions'].) To the contrary, the amended standard was very close to that which has long been applied by courts under the federal Equal Pay Act, 29 U.S.C. §206(d)."

Indeed, the legislative history of the 2016 amendment explains that the purpose of the amendment was to clarify "[e]xisting case law [that had] developed in such a way as to make it unclear whether 'equal work' means exactly the same job or a substantially similar job." (Committee Report, Analysis of Sen. Bill No. 358 (2015-2016 Reg. Sess.), Sen. Judiciary Committee Report, p. 7, April 27, 2015.) "Existing law generally prohibits an employer from paying an employee at wage rates less than the rates paid to employees of the opposite sex in the same establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . . [¶] This bill would . . . prohibit an employer from paying any of its employees at wage rates less than those paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility,

as specified." (Sen. Bill No. 358 (2015-2016 Reg. Sess.), ch. 546, Legis. Counsel's Digest.)[2]

Thus, the amendment to Labor Code section 1197.5 simply brought that section in line with case law under the federal EPA. The trial court therefore correctly observed that "the amended standard was very close to that which had long been applied by courts under the federal Equal Pay Act, 29 U.S.C. §206(d)." The court did not err in its understanding of the applicable standard.

### *Comparators Did Not Perform Substantially Similar Work*

Pak identified two GitHub employees, Avalos and Niv, as supposed comparators whose compensation exceeded hers. She asserts they "did not share Pak's status as [a] female of Asian heritage." Pak alleged Niv is a female "from Israel and her race and ethnicity is Jewish," while Avalos is a Hispanic male of Guatemalan descent.

Pak acknowledges any comparison of her job and Avalos's is "complicated" because he "received a number of titles after he was first hired in 2012." Nevertheless, Pak asserts she and Avalos had "substantially similar jobs . . . at least prior to 2015" when he "was in positions more similar to Pak's." (Capitalization omitted.)

---

[2] Pak also claims the trial court applied the wrong burden-shifting analysis, asserting the Ninth Circuit analysis should apply. She relies on *Rizo v. Yovino* (9th Cir. 2020) 950 F.3d 1217, which held "EPA claims do not require proof of discriminatory intent. [Citations.] EPA claims have just two steps: (1) the plaintiff bears the burden to establish a prima facie showing of a sex-based wage differential; (2) if the plaintiff is successful, the burden shifts to the employer to show an affirmative defense. No showing of pretext is required." (*Id.* at p. 1223.) However, as we shall discuss, Pak did not meet her burden of establishing a prima facie showing of a sex or ethnicity-based wage differential. We therefore need not and do not reach this issue.

Avalos began work at GitHub in 2012 as its first, and at the time only, in-house lawyer, and was responsible for all legal issues. Prior to joining GitHub, he practiced commercial and intellectual property law at Orrick, Herrington and Sutcliffe, followed by a corporate counsel position at Yelp.

In December 2013, GitHub promoted Avalos to general counsel, and in March 2014, promoted him again to chief legal officer. Avalos's duties included advising GitHub's executives and board of directors on legal issues, attending board meetings, and serving as the board secretary. He also continued to manage the growing GitHub legal department and was responsible for budgeting and "headcount." Avalos integrated GitHub's development platform into the legal department's workflow. He also was the company spokesperson on intellectual property (IP) policy, open source, and legal issues regarding technology and the internet.

Avalos spent about 35 percent of his time on legal projects, 35 percent on building and managing the legal department, 25 percent on advising management and the board, and five percent on spokesperson duties. Less than five percent of his time was focused on supporting the sales team and stock administration.

In October 2015, GitHub promoted Avalos to chief administrative officer. Avalos supervised and led all the " 'general and administrative' " departments, including finance and accounting, tax, facilities, deals desk, human resources and human resources operations, and the administration of international subsidiaries. He oversaw about 40 employees, including human resources managers, recruiters, accountants, business analysts, and office managers. Avalos led the creation of international entities and the recruiting and hiring of C-level and executive leadership. Avalos also maintained his general counsel/chief legal officer role, in which he served as the primary

11

source of strategy for the legal department, reviewed significant legal issues, and advised the board. These duties occupied about 40 percent of his time.

Avalos received legal industry recognition for his work. In 2014, the recorder awarded Avalos its inaugural award for legal innovation, and in 2015, GC Magazine and Legal 500 named Avalos the top technology in-house counsel in the United States.

As Pak acknowledges, in 2016 Avalos's responsibilities expanded substantially. He was responsible for working with the CEO and co-founder on both day-to day management and future business and product strategy. GitHub also assigned Avalos the task of overseeing branding, messaging, and visual design.

In March 2017, GitHub promoted Avalos to chief business officer. In this role, he supervised over 100 employees and hired senior leaders. He operated as the "public face of GitHub," speaking with the press and policymakers. He also "worked with technical teams to better align business strategy with product and engineering vision." Avalos also continued to serve in his general counsel/chief legal officer role, which then occupied about 25 percent of his time. GitHub appointed him to the board of directors in early 2017.

In August 2017, GitHub again promoted Avalos, this time to chief strategy officer. He maintained the bulk of his prior duties, while being given further authority over company and product strategy. Avalos played a "key role" in the Microsoft acquisition of GitHub, including meeting with the Microsoft CEO, reviewing and revising documents, and working on regulatory approvals.

Even considering Avalos's skill, efforts and responsibility solely in the years prior to 2016, Avalos and Pak did not perform substantially similar

12

work. Avalos always had considerably more responsibility.[3] Notably, Avalos began his career at GitHub as its first in-house attorney, and became its first general counsel, termed the " 'Legal Badass.' " He established and built the legal department, hired legal department staff, controlled the "legal spend," budget and headcount, and managed the department of over 10 people. He rapidly took on more work and increased responsibility. Indeed, by 2016, GitHub had promoted Avalos from in-house lawyer, to general counsel, to chief legal officer, to chief administrative officer.[4] Pak does not dispute Avalos built the GitHub legal department "from the ground up." While certain tasks performed by Pak and Avalos may have been similar, the scope of their positions was not. Avalos always held a position with Github with significantly greater responsibilities than Pak ever had at the company.

Pak asserts her "skills were greater than Avalos['s]" because Avalos "only graduated from law school in 2006 and thus did not possess anything close to Pak's skills or decades of experience" and "their efforts were similar."

Pak does not identify her claimed greater skills. Contrary to Pak's claim, the fact that she graduated from law school before Avalos does not demonstrate her skills were superior. Avalos had specialized skills and in-depth experience specific to GitHub. Indeed, Avalos was recognized in the legal field as "the top technology in-house counsel in the United States" in 2015. In contrast, Pak's experience did not result in her having the same

---

[3] "The equal pay standard applies to jobs the performance of which requires equal responsibility. Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations." (29 C.F.R. § 1620.17(a).)

[4] Avalos was subsequently promoted to chief business officer, then to chief strategy officer.

skills.  She had never built an in-house legal department from the ground up, nor did she have sustained legal experience with any one company, having held over 10 jobs prior to GitHub.[5]

As the trial court observed, Pak "was not hired to act as General Counsel. . . . [Pak] oversaw corporate and commercial work. . . . [Her] most significant responsibility was assisting the sales team. . . . [She] also had large administrative responsibilities and spent 10 to 33 percent of her time on stock administrative duties. . . . [Pak] spent less than 5 percent of her time supervising her 3-person team. . . . [She] did not hire personnel and did not participate in Board meetings."  Pak simply never held a position with the same level of responsibility or that was as all-encompassing as Avalos's.

Pak also identified Niv as a comparator.[6]  Avalos hired Niv in August 2013 as a Fellow "focused on IP and open source research."

Niv had served for three years as a lieutenant in the Technology Unit of the Intelligence Corps of the Israeli Army.  She had both computer science and law degrees from Tel Aviv University.  Niv had worked as a systems analyst and product manager for several startup companies.  She then moved to the United States to pursue a PhD in law and technology from the University of California, Berkeley School of Law.

At GitHub, Niv served as Avalos's "right hand."  She assisted him in building and expanding the legal department, developing GitHub's "vision, policies and thought leadership" for IP and open source philosophy.  She was responsible for "internal-facing work regarding the intellectual property

---

[5] Indeed, she was terminated from one position and left another because she did not get along with the CFO.

[6]  Niv had a lower salary than Pak's until February 2017, when she received a raise to the same level as Pak's starting salary.  She subsequently received additional raises.

portfolio" and "external-facing policy work advocating for software developers, open source and technology with policy makers and legislators." Niv participated in all legal department hiring decisions and managed the budget and "outside legal spend." She led a project revising GitHub's terms of service.

Niv spent 40 percent of her time on policy work, 30 percent on IP strategy projects, and 30 percent assisting Avalos manage and expand the legal department. She did not do any "commercial (*i.e.* sales team support) or corporate work other than very minimal support for Avalos and the team."

In September 2015, Avalos promoted Niv to director of legal. "Everyone" in the legal department other than Avalos reported to her, a range of five to ten employees. In that role, she was in charge of the "day-to-day management of the entire Legal department, which included the policy, corporate, privacy, product, intellectual property, employment, commercial and legal operations functions."

In January 2017, Avalos again promoted Niv, this time to vice-president, law and policy. She continued to lead the legal department, and also built a separate policy department where she led a team of four. Niv continued to manage the other five members of the legal department, as well as the policy department.

In her VP role, Niv spent about 35 percent of her time on legal operational management duties, 35 percent on policy department management responsibilities, 20 percent of her time on legal projects, and 10 percent of her time on policy work.

Despite Niv's broad responsibilities in management, policy work, and legal projects, Pak claims Niv's "level of responsibilities was not materially different from Pak's." (Capitalization omitted.) To the contrary, Niv's work,

15

in contrast to Pak's, was always weighted more towards technical IP and open source policy work and public advocacy. She also had significantly more managerial responsibility, supervising five members of the legal department, which included the IP, privacy, employment, legal operations, and product functions, as well as the three-person policy department. Pak, in contrast, supervised only three members of the legal department, two lawyers and one contract administrator, and spent less than five percent of her time doing so. Her responsibilities were focused on sales work, stock administration duties, and "legal advice on business development and finance matters."

As the trial court concluded, "Ms. Niv similarly performed tasks that were totally different than [Pak's]. Ms. Niv was the head of [GitHub's] Intellectual Property department and Open Source Strategy. . . . Ms. Niv did not spend any time on sales or corporate work. . . . [She] was in charge of the day-to-day management of the legal department and she spent most of her time on management and policy matters."

The undisputed facts demonstrate both Avalos and Niv had greater and substantially different responsibilities than Pak. When viewed as a composite of skill, effort, and responsibility, Pak did not perform substantially similar work to either comparator.

### The Retaliation Claim

#### Invocation of the EPA

Pak advanced two theories of retaliation. The first is predicated on an assertion that she invoked the EPA in the course of complaining about her compensation.

A plaintiff alleging an EPA retaliation claim under this theory must show she "invoke[d] or assist[ed] in any manner the enforcement of this section." (Lab. Code, § 1197.5, subd. (k)(1).) Simply complaining about

compensation in general is not enough: "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." (*Kasten v. Saint-Gobain Performance Plastics Corp.* (2011) 563 U.S. 1, 14 [considering antiretaliation portion of Fair Labor Standards Act (29 U.S.C. § 201 et seq.)]; see *Kassman v. KPMG LLP* (S.D.N.Y. 2013) 925 F.Supp.2d 453, 473 ["[N]one of [plaintiffs'] complaints rises to the level of specificity required to state a retaliation claim . . . as there is no indication that any Plaintiffs were actually complaining of EPA or NYSEPA violations such that these complaints constituted 'an assertion of rights protected by the statute' and a 'call for their protection.' "].)

Pak claims she invoked the EPA in the course of complaining to Avalos about her compensation. However, there is no evidence raising a triable issue that this is so.

In her complaint, Pak did not allege that she invoked the EPA in making her numerous complaints about her compensation.

And at her deposition, Pak said no such thing, despite exhaustive questioning by defense counsel about the specifics of every one of her compensation-related communications with Avalos. We have reviewed the entirety of the excerpts of Pak's deposition transcript in the record, and while Pak testified to many complaints about her compensation, she did not once testify that she accused Avalos of violating the EPA or paying her less because of her gender, race or ethnicity. Defense counsel also asked Pak repeatedly if she knew of any other communications regarding her compensation about which she had not testified, and she responded that she did not. Indeed, in response to counsel's question "[I]n terms of complaints

17

that you made to Mr. Avalos, you think you've testified about all of th[e]se?" Pak responded: "I believe so."

However, in opposition to GitHub's motion for summary judgment, Pak supplied a declaration recounting a different version of events. She asserted therein that "in a meeting with Mr. Avalos, I repeated my complaint that my compensation was less than others and I explained to him the Equal Pay Act." She further declared "[a]fter I complained to Mr. Avalos about the EPA violation related to my compensation, I recall I sent him an email with information about the EPA from a government website." She did not attach a copy of this supposed e-mail to her declaration, claiming "GitHub has refused to produce the evidence which would show in writing I made a claim under the EPA. . . ." She also attempted to excuse her failure to make any mention of this e-mail at her deposition, stating "I may not have mentioned this email at my deposition as I was not asked about that series of communications and did not have my emails or slack messages to refresh my recollection."

In opposing a motion for summary judgment, a party cannot create an issue of fact by a declaration which contradicts her prior discovery responses. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12; *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 860.) " 'In determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party.' " (*Id*. at p. 860.) Where " 'there is a clear and unequivocal admission by the plaintiff, himself [or herself], in his [or her] deposition . . . we are forced to conclude there is no substantial evidence of the existence of a triable issue of fact.' " (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21, italics omitted, disapproved on another

18

ground in *Woodland Hills Residents Ass'n., Inc. v. City Council* (1979) 23 Cal.3d 917, 944.)

The trial court therefore properly sustained GitHub's objections to Pak's "conflicting declaration," finding Pak "contradicts her sworn deposition testimony in paragraphs 39-40 of [her] declaration. Defendant's deposition questions to [Pak] posed broad, direct questions regarding [Pak's] compensation-related communications. Such questions encompassed conversations, written communications, or complaints regarding the Equal Pay Act or regarding other employees' pay. There was a 'clear and unequivocal admission' that [Pak] had testified in her deposition regarding all of her compensation-related communications. . . . [T]he Court finds that [Pak's] declaration is inconsistent with her deposition, and so her declaration statements must be disregarded."

Pak asserts the trial court erred because GitHub assertedly "acknowledged (backhandedly) that the email Pak described in her declaration, with its discussion of the EPA, did exist, but argued that, because it was not in evidence (after Pak's deposition GitHub identified the email and withheld it in its privilege log), Pak's description of the content of the email—which Pak could not read to refresh her recollection—was 'impermissibly vague.' "

While GitHub acknowledged in its reply memorandum that Pak had sent an e-mail to Avalos, it did not concede the e-mail raised the EPA in connection with Pak's compensation claims. Indeed, in its opposition to Pak's motion to compel production of that e-mail and other documents, GitHub provided a declaration by Avalos stating: "Pak 'sent me an email with a website link as part of a privileged project being discussed by the GitHub Legal Department, together with HR and the Employee Experience &

Engagement team.  When I received the email, I understood that it was in reference to this privileged project and I treated it as such.' "

The trial court denied Pak's motion to compel production of that e-mail, and it is not a part of the record as Pak has not challenged the court's discovery ruling on appeal.  She thus has forfeited any claim in connection with that e-mail.  In any case, Pak's carefully worded declaration about her claimed "explanation" of the EPA to Avalos and the e-mail she sent him with a link to a government website about the EPA does not demonstrate she invoked the EPA in connection with her complaints about her compensation.

In sum, there is no evidence raising a triable issue that Pak invoked the EPA or that she complained to Avalos or anyone else at GitHub that her compensation was improperly based on her gender, race, or ethnicity.

### *Discussing Compensation*

Pak's second retaliation theory is predicated on the provision of the EPA that prohibits retaliation for discussing employee wages.

In this regard, the statute states:  "An employer shall not discharge, or in any manner discriminate or retaliate against, any employee by reason of any action taken by the employee to invoke or assist in any manner the enforcement of this section.  An employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another employee's wages, or aiding or encouraging any other employee to exercise his or her rights under this section.  Nothing in this section creates an obligation to disclose wages."  (Lab. Code, § 1197.5, subd. (k)(1).)

In her complaint, Pak did not allege that GitHub retaliated against her for discussing her own or other employees' wages.  Rather, the operative complaint alleged simply that:  "Pak complained to senior officers at

20

GITHUB, including Avalos, an officer and member of the board of Directors of GITHUB, about her unequal pay during 2017 and 2018. [¶] . . . As a result of her lawful complaint, GITHUB retaliated against Pak and discharged her. Specifically, Avalos told Pak he was terminating her because of her complaints about unequal pay." It is well-established, of course, that a motion for summary judgment need meet only the claims made in the operative pleading, and a defendant moving for summary judgment need not anticipate claims the plaintiff theoretically could have, but failed to pursue. (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 ["the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint;* that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings"].)

Pak now claims she was "fired for discussing her own and others' compensation, an activity specifically protected under California's EPA."[7] (Capitalization omitted.) And she asserts an e-mail from Avalos "shows that GitHub violated the EPA *as a matter of law*," focusing on a statement therein that "[Pak] started weaponizing information that she is only allowed access to by merit of being the company's lead internal corporate attorney." Pak maintains it is "obvious" this referred to compensation information. and claims the e-mail identifies the "primary reason . . . for firing Pak."

Not only has Pak taken this language out of context, it does not, in any case, say what Pak claims is "obvious" or purport to state the "primary" reason she was fired.

---

[7] She also made this claim in passing in her opposition to the summary judgment motion.

The entirety of the portion of Avalos's e-mail regarding Pak stated: "[S]orry about [Pak]—we will send out note. [B]etter live; the situation escalated around the protest that she's been staging. [¶] We had been going down the path of transition and I opened that door to her several times—even asked her what her own idea of a graceful exit would be—and she ignored those and kept on with her tone-deaf and frustrating compensation and equity demands. [¶] Two things happened here: [¶] . . . she started weaponizing information that she is only allowed access to by merit of being the company's lead internal corporate attorney; and [¶] . . . she admitted [to] callously and unprofessionally and antagonistically and ridiculously to what we already knew—that she had gone on PTO during the last two weeks of the quarter out of protest and in order to force us to meet her compensation demands that were not in line with market data. [¶] Either one is a redline in most cases. But in the legal department especially, and in the context of the attorney-client relationship, it's pretty outrageous."

In context, Avalos's comment about "weaponizing" information does not suggest Pak was fired for discussing compensation with other employees. And there is no evidence that compensation data was "information that she is only allowed access to by merit of being the company's lead internal corporate attorney." [8] Indeed, Pak acknowledged that GitHub's employee manual expressly states, "We want to be clear: you can talk about your pay. The legal language is below, but the gist is that it is ok to talk, chat, confabulate or otherwise discuss your personal pay information with other Hubbers to the extent you feel comfortable. There is no cone of silence. Teams that have

---

[8] One of Avalos's criticisms of Pak in her performance review was regarding her "moments of indiscretion with stakeholders *outside* of the organization." (Italics added).

work-related access to confidential pay information, like HR and Payroll, will maintain that confidentiality."

Thus, contrary to Pak's assertion, what is apparent from the entirety of the e-mail is that it was Pak's work strike during the last weeks of the quarter that was the final straw for GitHub.

## DISPOSITION

The judgment is affirmed. Costs on appeal to GitHub.

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A159585, Pak v. Github, Inc.